*Davis and others *vs.* Shields.      [ *322 ]

A broker's memorandum is good, although no name be *subscribed* to it ; the substitution of the word *subscribed* in the revised statutes for the word *signed* used in the old statute, does not change the law. It is enough that the names of the parties intended to be bound appear *in the body of the memorandum.*

Where a sale is made through the intervention of a *broker* and in his *memorandum* terms of sale advantageous to the *purchaser* are omitted, it does not lie with the *vendor* to object to the memorandum in an action against him for the non-delivery of the property.

The rule of damages for the non-delivery of chattels sold is the market price on the day ap-

pointed for delivery less the contract price where the latter is not paid; it is of no consequence at what price the purchaser had agreed to sell to others.

ERROR from the superior court of the city of New-York. Shields brought an action of *assumpsit* for the non-delivery of a quantity of iron. On the 21st January, 1836, a *broker* employed by the defendants sold to the plaintiff fifty tons of English iron at $70 per ton, at a credit of six months, the iron to be in *good order* and the plaintiff not to be bound to take it unless it arrived in *reasonable time.* The invoice and bill of lading dated on the 30th *October*, 1835, were received by the defendants on the 4th *December.* The iron was shipped on board the brig *Anna,* which arrived between the 15th and 25th April, 1836. On 27th April, the plaintiff tendered $3500 in bank bills and demanded the iron, which the defendants refused to deliver. No objection was made to the tender being in bank bills. The broker made a memorandum of the contract of sale in 'his book of sales in these words : " Jan. 21st. Sold this day to George W. Shields on ac. of Davis & Brooks, fifty tons of English bar iron—say 25 tons 1¾ by ½—25 tons 1¾ by ⅝—50 tons at $70, to arrive on board brig *Anna ;* said iron to be in good order or no sale." The broker communicated the sale to the defendants, but no sale note was delivered to either of the parties. The defendants proved that the usual passages of ships carrying iron varied from 30 to 70 days ; that 170 days was a long passage, and that they considered the vessel lost.

[ *323 ] That *before* the sale to the plaintiff, and on the same day, they sold 50 tons of the iron expected by the *Anna,* to Messrs. Piersons & Co. of the same sizes with that sold to the plaintiff ; that the iron which came in the Anna consisted of 30 or 40 different sizes, and that the sizes sold to Piersons & Co. and to the plaintiff, fell short ; that the 50 tons sold to Piersons & Co. were duly delivered. The broker did not inform the plaintiff of the *previous* sale to Piersons & Co. The *defendants* also attempted to prove that the iron was not in *good order,* i. e. that it was *rusty,* but a member of the firm of *Piersons & Co.* testified that though it was somewhat damaged, in the spring of 1836 any thing was merchantable, and that the iron in question was merchantable ; but in ordinary times he would not have considered it so. The defendant sold several portions of the iron at $98 per ton, and amongst others they sold 8 or 10 tons at that price to an individual who had on the second day of *March,* purchased of the plaintiff that quantity at $80 per ton, if the iron arrived safe. The evidence being closed, the counsel for the defendants insisted : 1. That the memorandum of the broker was not a sufficient note of the contract, within the statute, 2 *R. S.* 130, § 3, because it did not contain the agreement as to the *time of payment,* nor the condition of arrival *in reasonable time,* and that it was not *subscribed ;* 2. That the contract was *mutually conditional ;* not op-

tional with the plaintiff and binding on the defendants; and 3. That the following contingencies defeated the contract: 1st, the iron did not arrive *in reasonable time*, which imported a reference to ordinary voyages, and professed to limit the period of exposure to a fluctuating market, and that double the time of the longest voyage is not reasonable time in contemplation of the contract; and 2d, the 50 tons sold to the plaintiff were the balance of a specific 100 tons *after* the sale to *Piersons*, and as the *whole quantity* did not arrive, the purchaser was not bound to accept a *part*. 3. That the plaintiff at all events was only entitled to recover, in reference to the price at which he contracted to sell, viz. $ 0 per ton. The chief justice charged the jury that if they should find that the iron was in good *order at the time of its arrival, then the plaintiff was enti- [ *324 ] tled to a verdict; that the broker's memorandum was sufficient; that the time when the iron arrived was, in judgment of law, reasonable time; that although the whole of the 100 tons of iron of the description of the 50 tons sold to Piersons & Co. and to the plaintiff, did not arrive, the contract was not, under the circumstances of the case thereby defeated, nor the defendants discharged therefrom; and that the plaintiff was entitled to recover damages at and after the rate at which the defendants contracted to sell the iron to the plaintiff, comparing with the rate at which the defendants sold it to others. The defendants' counsel excepted to the charge, and the jury found a verdict for the plaintiff, with $1516, 81, on which judgment being entered, the defendants sued out a writ of error.

*D. Lord, jun.* for the plaintiffs in error.

*J. Taylor & D. Selden,* for the defendant in error.

*By the Court,* COWEN, J. The two classes of objections collateral to the memorandum of the contract in question admit, I think, of short answers. The first objection is, that the broker departed from his authority, in omitting to state the *time of credit* and the *condition of arrival* within a reasonable time; in other words, that the contract stood in his book as a cash sale, and imported an obligation to receive at whatever time the ship might chance to arrive, though delayed beyond a *reasonable time*. That in this he exceeded the authority conferred on him by the plaintiff below, may I think, be conceded without the least prejudice to his claim. The terms omitted were restrictions which he imposed upon the broker for his own benefit, and were no doubt in fact more favorable to him than those actually inserted in the memorandum. To this, however, it did not lie with the defendants to object; nor do they appear to have done so in fact. The plaintiff certainly had the

[ *325 ]

right to object; but he chose to adopt an act upon the entry of his agent as true, although this resulted in the harder terms *of immediate payment, and unreasonable delay. The rule in such case is *omnis ratihabitio retrotrahitur et mandato æquiparatur. Long on Sales*, 402, *Rand's ed.* 1839. This rule extends as well to an authority for executing a contract in conformity to the statute of frauds, as to any other; and if the contract relate to the sale of goods or any other act required to be in writing by *title* 2, in 2 *R. S.* 70, *2d ed.* the authority need not be in writing, whether it arise from original delegation, or subsequent adoption. *Per Jackson, J. in Lent* v. *Padelford*, 10 *Mass. R.* 230, 236. The propriety of applying the maxim *omnis ratihabitio, &c.*, to such cases, was very fully considered by the C. B. in the late case of *Maclean* v. *Dunn*, 1 *Moore & Payne*, 761, 766, and conceded in this very case of a broker's memorandum. 4 *Bing.* 722, *S. C.*, more briefly reported. Best, Ch. J. cited two previous cases to the same effect, *Kinnitz* v. *Surry, Paley's Pr. & Ag.* 143, *n.*; and *Soames* v. *Spencer*, 1 *Dowl. & Ryl.* 32. They are to the exact point; and the surprise is, after what Best, C. J. said in *Moore & Payne*, and *Bingham*, that the question should ever have been raised. In regard to the assent of Davis & Brooks, beside its being palpably unnecessary in respect to the terms of the contract which made in their favor, still, if that were not so, their subsequent assent should, *prima facie*, be presumed. *Vid.* 1 *Phil. Ev. Notes by Cowen & Hill, pp.* 301, 303. The conditions, as the broker swore, were communicated to them, and we hear of no dissent by them on account of a supposed departure from authority in making the contract most favorable to their side. But even if they had actually dissented on such ground, who ever heard of such an objection being allowed? I tell an agent to sell my horse on *credit*, and he brings me *gold*, who ever thought I could object that he had exceeded his authority? The more favorable term is always implied by law in the very act of employing an agent. 1 *Liv. on Ag.* 97. The term of arrival in reasonable time was obviously a mere proviso or condition on the side of the vendee, with which the vendors had nothing to do, by way of objection on their part.

[ *326 ]

*The objections, that the iron did not, in fact, arrive in reasonable time, and that it did not answer the sizes mentioned in the memorandum, are much of the same character with those in respect to the want of authority. These objections assume that the contract was correctly drawn up, but insist that a certain condition and stipulation in favor of the plaintiff has not been complied with. As to the condition, the rule is that the party in whose favor it is intended to operate may waive it. *Cranfield* v. *Crane*, 5 *Cowen*, 270, and several cases in the notes, *id.* 271 to 273. *Per Putnam, J. in Hunt* v. *Livermore*, 5 *Pick.* 397, 398. *Poth. on Obl.* No. 47, 48. 1 *Ev. Poth.* 28, *Lond. ed. of* 1806, *Malins* v. *Freeman*, 4

*Bing. N. Cas.* 395. *Doe, ex dem. Bryan,* v. *Bancks,* 4 *Barn. & Ald.* 401.

The objection that the whole amount sold did not arrive, and so the defendants could not deliver it, and the plaintiff might be off, is a singular one in the mouth of the defendants. It is, in plain English, thus : " I have broken my promise, and therefore my promisee has no right to recover damages against me." The defendant made an executory contract with the plaintiff to deliver 50 tons of iron described or rather hinted at as of certain sizes, deliverable out of the Anna's cargo which had not yet arrived. The iron either arrived or it did not ; the defendants refusing to deliver it had, in either case, broken their contract. If it arrived, and was under size, or otherwise not answerable to the description, and the promisee waived the objection, then the vendor is entitled to the benefit of the waiver ; and should have delivered such iron as he had. At any rate, it is of the essence of a contract, that the promisor or covenantor should be bound, and not have it in his power to discharge himself at his pleasure. *Poth. before cited.* The settled rule of construction, even where the contract expressly provides, that, on non-performance by the promisor or covenantor, it shall be absolutely void, makes it so only at the option of the promisee or covenantee. This was expressly held by the cases just cited from my reports, and from *Barnwall & Alderson* and *Bingham's N. Cas.*

The rule of damages laid down by the chief justice was *corrected. [ *327 ] That rule, on breach of an agreement to sell goods, is the market price at the day appointed for delivery, less the contract price, when the latter is not paid, *Dey* v. *Dox,* 9 *Wendell,* 129, *Clark* v. *Pinney,* 7 *Cowen's Rep.* 681, without reference to the price at which the vendee may have promised the goods to others in the mean time. If the plaintiff had bound himself to give the iron away to a friend or relation, on what principle could that circumstance be used to affect the damages as between him and the defendants ?

The objection most relied on, and certainly the most plausible one, is that arising on the face of the memorandum. This was not literally *subscribed.* The objection rests on the revisers' introduction of this *new* word into our statute of frauds, 2 *R. S.* 70, 2d. ed., instead of the word *signed,* which was the one used in the former statute. It is, I think, enough to answer that the words *signing* and *subscribing,* when applied to a contract or other instrument, always, in common understanding, meant the same thing, viz. a writing of one's name at the bottom. The legislature have themselves used the two words as synonymous in the statute of wills. 2 *R. S.* 7, § 40, 41, 2d ed. So clear and universal was this understanding of the word *signing,* that its use in the old statute was at first supposed to require an actual subscription at the bottom. It was at length agreed however, that the word might have a secondary sense, and indeed must have, or the statute would

in many cases annul contracts when the name was written or inserted in some other place, with the equally obvious intent of giving authenticity to the instrument.    Accordingly an attestation as a witness, a letter written assenting to the terms of some unsigned memorandum, or names inserted in the business memoranda of brokers, auctioneers, &c. though only in the body, if done with intent to preserve evidence of the transaction, were holden to be a substantial compliance with the statute, because they placed the matter beyond the danger of mere oral evidence, equally with a literal signing by subscription.   *Roberts on Frauds*, 119, *Am. ed. of* 1807.   *Long*
[ *328 ]   *on Sales*, 57, *et seq.*, *Rand's ed. of* 1839, *and the cases there cited.* *Fell on Com. Guar. ch.* 4, *p.* 88, *et seq. Am. ed. of* 1825, *and the cases there cited.*   Even an insertion of the name by the broker in a bare pencil memorandum has been held sufficient.   *Merritt* v. *Clason*, 12 *Johns. R.* 102.   14 *id.* 484, *S. C. on error.*

It requires no greater judicial effort to enlarge the word *subscribe* into a secondary sense, than the word *sign ;* and such a sense was perhaps oftener given to the former in common parlance.   I do or do not *subscribe* to such a sentiment or doctrine, signifies mere assent or dissent without the act of writing at all ; and, indeed, that is one of the principal senses ascribed to the word by Johnson in his quarto dictionary, where it is illustrated by a passage from Hooker.   In that he says it simply signifies *to give consent*, the very object which the statute of frauds is in search of, and it was always satisfied if the name was written or even printed in such a connection or under such circumstances as to indicate consent to become bound.   Among other things it looked to the course of business, and found the omission of the name at the bottom very common among brokers, auctioneers and other agents.   It adopted such acts as signing because the intent was plain, and they were as much beyond the evil intended to be remedied by the statute, as if the name had been placed at the foot.   *A judge signs a record* in the margin ; and there are peculiar places of affixing the name for the purposes of authentication in various branches of business, without coming up to the common notion of signing.   With brokers, auctioneers, correspondents, &c. whose acts are very commonly to be tested by the statute of frauds, all must be void, were the courts suddenly to wheel about, and turn their faces against the former principles of construction.   They would thus subvert half the contracts of sale in the most commercial portions of the state—a 'mischief which I admit they must do if the new and revised statutes have left them no alternative.   But the principle of construction remains the same, and rests on a broader foundation, and a state of things calling more imperiously
         for its enforcement in proportion as memoranda of the kind in
[ *329 ]   question, have long had a direct sanction, *not only in the usages
         of business, but under the statute of frauds itself.   A subscrip-

tion, by merely inserting the name, is as effectual a guard against perjury and fraud as it ever was. Being out of the, mischief which the statute intended to avoid, it is therefore out of the statute itself. If an authority be wanting for such an obvious principle of construction, take the words of Lord Hardwicke in *Welford* v. *Beazely*, 3 *Atk.* 503. There the party to be charged had merely put his name as a witness. The lord chancellor said, " The meaning of the statute is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other ; and, therefore, both in this court and the courts of common law, where the agreement has been reduced to such a certainty, and the substance of the statute has been complied with in the material part, the forms have never been insisted upon." The law requires that a bill or note payable to order should be *endorsed*, in order to its transfer, and the subjecting of the payee to certain definite liability ; yet if he had put his name on the *face* or *elsewhere* on the paper, or a paper annexed, with intent that the act shall operate as an endorsement, it is the same thing, because the substance of the legal requisition is thus fulfilled. This has been often held.

I will not now do more than advert to the general evil of considering every literal or verbal deviation in our revised statutes from the former acts which they adopt, as a change in substance. We had occasion to consider it in some measure at the last term, especially in respect to the statute of frauds ; and daily observation confirms the views then expressed with regard to all such former statutes, as entered into and governed the general business of the community. They made and will continue to make a part of the commercial and social habitude ; and even where an alteration was obviously intended, and was plainly expedient or necessary, a century must perhaps go by ere the change will be actually effected. Some fifty or more years have passed since a very necessary alteration was made by statute in the denomination of our currency ; and although the necessity was universally conceded, perhaps fifty more will *not practically complete [ *330 ] the change. To make the numerous verbal alterations in our revised statutes, in all or even a majority of instances, an actual departure from the former law, would be to open Pandora's box. The evils would be intolerable, and the whole community would ot once demand their repeal.

Judgment affirmed.