By the Court. Woodruff, J.
—The defendants, in June, 1852,, being desirous of obtaining a loan of five millions of dollars in England, as a part of an ingenious scheme by which they proposed to construct their railroad by borrowing the money therefor, to be repaid out of the .sale of their bonds pledged for the loan, and believing that the road might be so built without requiring the payment of the capital stock, issued, in England, proposals for such loan.
In those proposals, they say:
*522 “ The Illinois Central Railway Company have thus decided to raise the money necessary for the construction of the railway by the issue of its bonds, secured on the land and railway, will create, notwithstanding, a share capital equivalent in amount to the sum raised on bonds; and which will be issued in one hundred dollar shares, to represent the proportionate interest of the respective holders in the undertaking. It is proposed to give the privilege to subscribers of the loan of 5,000,000 of dollars, now offered, to become shareholders therein for one-half of that subscription ($2,500,000); and as it can hardly be doubted that the bonds will be paid off by means of the sale of lands, there is every probability that the railroad will be constructed without any call on the share capital. A small deposit may be required on the shares; and these shares will thus become an actual bonus, and entitle the holder to a participation in all the profits of the line.
“A banker’s receipt will be given in payment of the first deposit on the bonds, which will be exchanged for the provisional certificates (i. e., certificates entitling the holders to bonds, with coupons annexed, when the installments were all paid,) as soon as they can be obtained from America; and at the same time a further provisional certificate, ; entitling the bearer, in addition, to fifty per cent, on the amount of his subscription to the bonds, in the-capital stock of the company, will be delivered to him.
'! “ The provisional certificates will be exchanged for scrip Í shares on payment of the last installment on the bonds. (Four persons in England are then named as trustees, to receive all the payments from the subscribers to the, loan, and “act between” them and the company; and the proposals then continue:)
“It is arranged that the installments on the bonds shall not be paid over until the company have deposited in the hands of the trustees the necessary provisional certificates for the same, as well as the bonds themselves, and also the scrip certificates, for the agreed amount of share capital.”
Looking to these proposals, and to an acceptance thereof *523 by a subscription to the proposed loan, as constituting the actual contract between the company and the subscribers, it would not have occurred to me that the company thereby intended to give, or did give to those who should become parties to the loan, any unlimited option to take stock in the company or not, at whatever future time such subscribers saw fit; or that the proposed arrangement was liable to the charge of illegality, as contravening the design and object of the- charter by restraining the company from disposing of its stock and collecting such installments as it might be necessary (if any) to call in on account thereof. The charter of the company authorized the directors to issue stock to the whole amount which might be expended on account of the said road, but it made the power to issue stock, and the stock, when issued, subject to the power of the directors to require the payment of sums subscribed by stockholders in such manner and on such terms as they might deem proper.
When the proposals above referred to were issued, and the loan made, it was undoubtedly believed, as therein represented, that no payment would be required from the stockholders, save only the small deposit mentioned; but I think it must, nevertheless, be conceded that the company had no authority to enter into an agreement by which-the power tó issue the requisite amount of stock to carry out the purposes of the charter, and to call in payments from the shareholders, would be indefinitely postponed. The power was, however, expressly given to increase the stock from time to'time to the requisite amount; and to my mind, an agreement to give to one who should subscribe to a loan, and pay the installments thereof, the privilege of becoming a stockholder, is not illegal merely because until the installments of the loan were all paid it could not be certainly known whether his title to the stock was absolute, although, in the meantime, the right of the company to issue that stock to others would be restrained. Such an arrangement, obviously made in furtherance of the design and object of the charter, and in good faith to *524 secure the construction of the railroad, and only operating incidentally for a reasonable time to make it uncertain who would be the shareholders, is, I think, free from the objection that it contravened either the express provision or the policy of the charter.
If, then, the arrangement made by the defendants, by and under their proposals above mentioned, did no more than secure to subscribers to the loan the privilege of also becoming shareholders, with a condition that if they did not advance all the installments of the loan according to the terms of their subscription, they should not be entitled to shares, I cannot regard it as illegal or beyond the powers of the defendants.
Indeed, I do not understand that, if the true construction of the arrangement be as above stated, it is claimed to be illegal. Illegality is alleged of the arrangement upon the ground that there was no limit to the option given to the subscriber to take stock at any future time he might choose. As I do not think that is the true construction of the arrangement, I have defined what I deem to be within the power of the company, and the inquiry, what is the true construction of the agreement, will now be considered.
I observe, then, that the subscribers to the loan (and of course the plaintiff,) acquired some right by becoming parties to the loan, i. e., by consenting to its terms, and agreeing to advance their money to the company; which was at or before the time of the payment of the first installment of the loan in London, in July, 1852, and before any provisional certificates, either for bonds or stock, were obtained from America.
By the terms of the proposals, what were those rights ?
1st. The company had promised them a security for the repayment of the loan in a particular form.
2d. To induce them to subscribe, the company offered them the privilege to become shareholders to the amount of one-half their subscription; and promised them provi *525 sional certificates, entitling the hearer to that amount in the capital stock.
The privilege offered, was to take stock. The subscriber was not bound to take stock, but most glowing representations were contained in the proposals, showing the value of the privilege tendered, and the certain profit he would derive from holding the stock; and the right to a provisional certificate, which should entitle the bearer to the stock named therein was absolute; the company bound themselves to deliver it to the subscriber. The shares were regarded as a “ bonus” to induce the loan, and it was not at all regarded as doubtful what would be the option of the subscriber, and hence, the proposals speak of giving “the privilege,” and whoever accepted the privilege, xvas promised a certificate, which should entitle him to the stock. But this certificate was called a provisional certificate ; it was to be a “ provisional certificate, entitling the bearer” to the stock. If the proposals had not otherwise defined it, it would be difficult to say what was meant by “provisional” certificate ; the explanation is found in the next clause; it was to be exchanged for scrip shares on payment of the last installment on the bonds. This, then xvas what xvas meant by “ provisional.” It was not to be an absolute certificate for so much stock, but a certificate which entitled the bearer to so much stock, and which would be exchanged for scrip shares on payment of the last installment on the bonds. The certificate was provisional, inasmuch as the title it conferred depended on the making of all the payments or’ advances on the loan subscribed; it was that condition and nothing else that made the certificate provisional, and that condition was created by force of the xvords “ on payment of the last installment on the bonds,” which, by just construction, import that no installment remains unpaid.
I think it quite clear, that on the issuing and acceptance of these proposals, while it was on the one hand believed that the offer to give stock was the tender of a privilege, and so there was no idea that any subscriber would decline *526 it, yet on the other hand, as it was the mere tender of a ! privilege, any subscriber might decline it if he saw fit; and until the subscriber in some manner accepted or de- ’( dined the privilege, it remained at his option ; but when a “provisional certificate” conferring the stipulated title was obtained from America, and. was delivered to the subscriber according to the agreement, and was accepted by him, there is much ground for saying that no further option on the part of the subscriber was contemplated by the parties, and no further option existed by force of the agreement ; and -the moment the condition was satisfied by the payment of the last installment on the bonds, the title of I the bearer to the scrip was just as absolute as his title to | the bonds; and it was secured • to him in terms of precisely equivalent force.
By a previous stipulation, it was provided in regard to ' provisional certificates, which were to be issued to the subscribers as soon as they could be obtained from America,
; after the payment of the first deposit, to secure the delivery of the coupon bonds; that “ on the remaining payments being completed, the provisional certificates will be exchanged '• for the bonds.”
So in regard to provisional certificates for stock, “ the provisional certificates will be exchanged fer scrip shares on payment of the last installment on the bonds.”
Paying the last installment, and completing the remaining payments, in good sense, means the same thing; else we must say that a subscriber would be entitled to his scrip shares, although he had paid no installment but the first and last; and the title of the subscriber to his scrip was precisely the same as his title to his bond, when he had completed the payments, which constituted his loan to the company.
And this view is further sustained by the further security given to the subscribers in this, that the trustees in England, into whose hands the money was to be paid, were not to pay it over to the company, until not only the provisional certificates were received to be delivered to the *527 subscribers, but the bonds themselves, and the scrip shares also, were deposited in their hands; thus, I think, making it plain that no further option or choice on the part of the subscriber was contemplated, but his title to scrip was placed on the same footing as his title to bonds, and rested on precisely the same condition, to wit: completing his payments towards the loan, and on the performance of the condition was alike absolute.
And now if we turn from the face of the proposals, and look at the provisional certificates which were drawn up, executed and sent to England for subscribers there, and delivered to the plaintiff here, the, foregoing views are sustained respecting the meaning and intent of the parties.
The provisional certificate for bonds, after mentioning the amount, and the dates at which installments of the loan are to be paid, with the privilege to the bearer of paying at any earlier date, certifies: “ After the payment of the last installment, these provisional certificates will be exchanged for definite construction bonds, having the half-yearly interest warrants attached.”
The provisional certificate for stock, after specifying the amount and numbers of the bonds subscribed for, “ certifies that the bearer hereof will be entitled, on and after the 1st day of October next, to scrip certificates for (a specified number corresponding with the one-half of the amount of the bonds referred to,) shares in the capital stock, * ' * * on presentation hereof at the office of Messrs. Heywood, Kennards & Co., bankers, London. Provided, all the installments on the subscription for the bonds numbered as above, shall then have been fully paid up.”
Here as before, the conditions upon which the subscribers are to have bonds, and upon which they are to receive scrip for stock, are identical in effect. Here it is after-payment of the last installment that the bonds are to be delivered, and the subscriber is to be entitled to his scrip for stock; provided all the installments were paid, and his *528 right to' each under these certificates was alike absolute on performing the condition
In this certificate for scrip, the form used shows precisely what was meant by the term provisional, and that it was what has been already above stated, viz: provided all the installments shall have been paid; and not provided the subscriber shall on the day on which the last payment is made elect to take them.
So that the certificate for shares in this respect conforms to the proposals ; and when it was delivered and accepted by the subscriber, if it contains in itself all the elements of a contract between the parties, and is free from ambiguity, its construction must govern their rights.
I suggest this, not because I think that so far as relates to the question before us, there is any inconsistency between the certificate and the proposals; but if there was any difference amounting to a modification of the proposals, the certificate must govern, for it was made, executed, delivered and accepted, as performance of the agreement.
In two particulars, the certificate embraces provisions not included in the proposals, though not inconsistent therewith. They are not only to be deemed assented to, but both of them show in the most marked manner that the parties did not either in making or accepting the proposals, or on the delivery and acceptance of the provisional certificates for stock, contemplate as a part of the agreement any further or future exercise of option by the subscriber, to be declared and determined on payment, {i. e., at the time of payment,) of the last installment of the loan.
The first provision to which I now refer is, that the bearer would be “ entitled, on and after the first day of October next, to scrip,” &c. Here was something not included in the proposals. By them, the subscriber had the privilege of paying up the whole subscription to the loan at any time; and was to be entitled to his scrip shares so soon as the whole subscription was paid. But, by the terms of this certificate, he was not necessarily to be enti *529 tied to his scrip on paying up the loan, if that was done before the first of October. He must wait until on or after the first of October; and then he might receive his scrip. This shows that, in a class of cases provided for, the delivery of scrip shares and the payment of the last installment would not be simultaneous; and that the idea, that there should be any declaration of option at the time of paying up the loan, was not in the mind of the parties. The only condition was, that when the scrip was called for, then all the installments of the loan must have been paid ; else the scrip was not deliverable.
The other provision to which I refer is, that the bearer was entitled to scrip for the requisite number of shares, “ on presentation hereof at the office of Messrs. Heywood, Kennards & Co., bankers, London.” Here, also, is a special condition, introduced into the certificate, not contained in the proposals. The subscribers to the loan were to pay their installments to certain four gentlemen, named in the proposals (Brown, Heywood, Smith and Uzielli), who were to “ act as trustees between the company and the bondholders ;” and now, by the terms of the certificate, the subscriber was to receive scrip for shares on the presentation thereof at the office of Heywood, Kennards & Co., bankers, provided all the installments had then been paid. Nothing here suggests the idea that the payment of the installments and such presentation-were to be simultaneous. They were several distinct acts; both were to be done. The presentation, to be of any avail, must be after the payment. If the subscriber had any option to exercise, it consisted in the act of presentation; and nothing here intimates that he was to decide, at the time when he made the last payment, whether he would make such presentation or not. Nor indeed, according to my view, already expressed, did this certificate contemplate any remaining option in the subscriber to take, or decline to take, stock; it assumed that, having made his advances—having already accepted his certificates for scrip—he would of course, desire to have the benefit of the “bonus,” which *530 had been made a prominent inducement to subscribe; and the certificate secured the scrip to him on presentation thereof at the office named. It was making the scrip deliverable on demand; hut as the company were not in England, it designated the office of their bankers as the place of demand.
Again, when the defendants declared the conditions upon which the bearer would be entitled to scrip, they did say that it should be “on and after the first day of October;” “on presentation of the certificate;” and, “provided all the installments were paid.” Expressio unius est exclusio alterius. They did not, also, declare a proviso that such presentation should be made at the time of making the last payment; nor say anything suggesting any other condition than those expressed in terms.
,If the company intended, by this certificate, to give an option to the subscriber to take or decline the scrip until the loan was fully advanced, and to limit that option to the day when the last installment was advanced, or was to be advanced, it would have been perfectly easy to so express it; and it is incredible that they would not have. done so.
My conclusion, therefore, is — upon the face of these papers, upon the proposals, and, even more strongly, upon the certificates—that the parties never contemplated the exercise of any future 'Option by subscribers after they had accepted the provisional certificates, entitling them to scrip, provided the installments of the loan were paid up. The privilege tendered by the proposals had served its purpose, been accepted; and the subscriber had his provisional certificates as evidence of his right to scrip. The parties regarded the gift of the stock as gratuity; or, at least, as a premium for having made the loan. What they aimed to secure, and did secure, was the delivery of the scrip to which the subscriber had become entitled; and they did not propose merely to secure to him a choice to be exercised at a future day. That the bearer was “ entitled to scrip ” meant something; and, in my opinion, it meant just *531 what the words, in a certificate of stock—A B “is entitled to” ten shares of stock—mean; not that he has the privilege of taking them if he pleases. He may, or may not, upon some ground, either of fact or law, have it in his power to reject or disown them; but the import of the certificate is, that he has title to them.
I have thus far considered the subject as if the plaintiff was not only a subscriber in England, but had paid his installments, and become entitled to his scrip there; and I do not understand it to be claimed by the defendants that, in respect to any question arising on the face of the papers, his rights do not stand upon precisely the same footing as any other subscriber. The only change being that, by arrangement, all of the transactions with him, after the payment of the first installment, were transacted in the city of New York. Hence it is not claimed that it was not proper for him to demand his scrip here, or that he was bound to make presentment of his provisional certificate at the office of the London bankers, but the verdict shows the admission that his demand in New York was to have the same effect as if made at the designated office in London.
If we are to regard the special finding of the jury as determining the actual transactions between the plaintiff and the defendants, then, in addition to the considerations above suggested, we have a cotemporaneous exposition of the right of the plaintiff entirely irreconcilable with the agreement that the plaintiff was to take the scrip at the time when he paid the last installment of his loan, or that the words “ on payment of the last installment,” had the double force of a condition upon which he should be entitled to have scrip, and of a' limit to the time within which he should take it.
The special verdict finds that “ the plaintiff, having completed the payment in JYew York of all the installments upon the bonds taken by him under his subscription, the defendants’ officers delivered to him the provisional stock certificates,” &c.
*532 It also finds that “the last installment on the loan was paid in January, 1853.”
If this be so, then the provisional certificates themselves were delivered to the plaintiff after he had paid all his installments. How, then, can it be said that by thesé certificates there was secured to him an option to take scrip, provided he elected to do so at the time he made his last payment? This would be -an impossible condition—the time for such an election was already past.
If the fact be correctly found, it is utterly fatal to the suggestion that the making of the last payment was a time limited after which the subscribers could not claim scrip for shares.
I advert to this without making it a controlling feature in the case, for I find it is stated in the complaint that' these certificates were delivered to the plaintiff on or about the first of October, 1852, and the complaint plainly imports that the plaintiff had not then paid all the installments.
Whether the special verdict should control on this point, and the complaint be conformed to the facts proved, or the complaint should be deemed to conclude the plaintiff, notwithstanding the verdict, I do not stop to inquire, because my conclusions, for other reasons above stated, would be the same regarding the true construction of the arrangement between the parties.
Does it necessarily follow from these views that the plaintiff, by virtue of the provisional certificates, was at liberty to delay the taking of the scrip, to which he was entitled, for an indefinite period, during which it would be wholly uncertain whether he would become a stockholder or not, and so the defendants be deprived of the power to give the stock to others or collect thereon such sums as might be duly called in from stockholders ?
Not at all. The plaintiff having paid his installments, had acquired' a right to scrip for the stock, and the defendants were bound to deliver to him the scrip on his demand; but ownership of the stock involved the duty of *533 paying all installments which were called in by the board of directors according to the charter.
The postponement of the delivery of the scrip until all the installments of the loan were paid, was not for the benefit of the subscriber, but was intended as a security to the company.
The company were not bound to deliver until the installments were paid. This was not for the purpose of giving the subscriber time to consider and elect whether he would take stock, but to prevent his taking the stock and obtaining the benefit thereof, and then fail in paying the whole amount of his subscription to the loan.
The moment, then, the subscriber’s right to the scrip became perfect by the completion of his payments, the correlative right of the company arose to have from him the amount which had been assessed upon the shares and duly called in, and thenceforward, from the very nature of the subject, each party had the right to call upon the other to perform his duty in respect thereto.
The company could demand of him the assessments, and he could demand of them the scrip for the stock, to which, by paying any assessments already made, he would be entitled.
This right to scrip for stock was subordinate to the provisions of the charter, under which the board of directors had power to call in from shareholders such amounts as they might think proper; the agreement resulting from the proposals for a loan, and the acceptance thereof by the subscriber, and the provisional certificate all contemplated, the giving of the right to scrip, subject to this power in the board of directors, and of course with a resulting duty in the subscriber to pay the assessments imposed.
The consequence of this view is, that the company had the right to require of the subscriber, at any time after he had paid in the whole loan, that he pay the assessments which had been made, and the right to tender to him the stock.
It is not necessary to decide whether, if he refused on *534 such tender, his right- even to have the stock was gone, or whether, if he refused, the company would have been compelled to resort to the proceedings prescribed by law, as for a forfeiture of stock, in order to preclude any future claim thereto; it is enough to say, that until such tender and refusal, the subscriber was in no default, and forfeited no right ; and on the other hand, the power to make such tender and demand payment of the assessments protected the defendants. But by one or other of the modes designated, I have no doubt the right of the refusing subscriber would be legally terminated.
. If,'in the conclusion that it was not intended to give by force of the proposals and provisional certificates an option to the subscriber to continue until the installments of the loan were paid, I am wrong, and the true construction be, that the subscriber had secured to him by the provisional certificate, not a title to scrip, but an option to take stock or not, then in my judgment the result above stated is equally clear. It has been I think shown that no time for the declation of that option was fixed in the certicate. The exercise of the option would involve reciprocal rights and duties. It would entitle the subscriber to receive scrip for his stock, but it would -at the same time entitle the defendants to receive the assessments which had been imposed thereon. The provisions of the charter, and the power of the directors to call in assessments from the shareholders, and the object and purpose of issuing stock, to carry into effect the purposes of the charter, forbid that the option should be perpetual, and beyond the ' power of the defendants, by a proper tender and demand, to limit it. And the very argument that it would be illegal thus to place it out of -the power of the company to call in the amount of the capital stock, .also forbids such a construction.
In such case, i. e., where an option beneficial to a party is given to him, as for example an option to purchase, which if exercised will involve the duty to pay, and no time is specified within which to elect, I apprehend the *535 vendor may make the tender, and require the determination of the election at any time, and so, also, the option will continue, until one or the other terminates it by demand and tender of performance.
Whatever may have been the views of the defendants at the time of the original subscription, it is obvious that in March, 1854, the board of directors understood, and acted upon the assumption, that the subscribers were not only not limited to the time when they paid the last installment, in making their election, but that the option given to them was an election to become subscribers for stock, if they saw fit; and their action on that day recites that as to some of the rights of subscribers, no particular time for making such subscription or determining that option had been specified; and they recognize the duty on their own part to take some affirmative action to determine that option.
If, instead of attempting arbitrarily to fix a future day named, and declaring that no subscription should be made after that day, they had tendered to the plaintiff his stock, and demanded payment of the assessment of five dollars, and he had refused to accept the stock and pay the assessments ; there would be great force in their claim, that such refusal terminated the right of choice, or rather was an exercise of his right to choose, and ended all claim of right to subscribe at a future time.
But it is plain, I think, that no ex parte action of theirs could alter the contract with the plaintiff, affect his right to stock, or terminate his option, if this right was a right of option, instead of a title to scrip for stock.
These views make the contract between the parties in all respects reasonable and just, and well calculated to promote the objects of the charter. They show no undue restraint upon the company, in respect .of its power to issue the stock of the company and call in assessments, as they might be required. They give no unreasonable advan- . tage to subscribers to the loan, serving as a cover for “speculation upon the rise and fall of shares.” They *536 place the company and the subscribers on an equal footing in this respect; and enable the company to terminate the option or the right to the scrip, on tender of delivery’ and demand of paymemt of the assessments, or by forfeiture, as in case of an actual subscription; while the subscriber’s right to take stock continues until he is put in some default by a refusal to accept it.
The limitation contended for, which would limit the subscriber’s right to October, 1854 (the time until which the subscribers might, if they thought proper, defer the last installment of the loan), is so inconsistent with the former suggestions, and especially with the provision that enabled any subscriber to pay as much earlier as he chose, and declared him entitled to scrip on and after October, 1852. on presentation, &c., provided all the installments had then been paid, that it does not seem to me necessary to enlarge upon it.
It is argued that the memorandum at the foot of the provisional certificate, in the words “N. B. The exchange of the provisional certificates for the scrip certificates is limited to 1st January, 185 ,” shows that a time for its exchange was in fact limited, and gave the plaintiff notice thereof; so that it became in effect the agreement of the parties.
If it showed him that it was limited, to what time did it apprise him the limit attached ? There is no proof of an actual previous agreement, other than what has been already considered. There is no proof of any action of the company by any resolution, fixing an express limit, until March, 1854; when their resolution indicates that, as to some of the subscribers at least, no limit had been fixed.
The delivery of the provisional certificates to the plaintiff, without inserting a date, would only suggest to him that whatever arrangement the defendants might make with others receiving provisional certificates, they fixed no such peremptory limit to his right; and to this, as I think, must be added, the company had no right, without . the plaintiff’s consent, to insert any such date, so as to *537 insist afterwards that he assented to it by accepting the certificate.with the memorandum.
The considerations suggested necessarily lead to the result, that down to the 22d day of January, 1857, the plaintiff’s right to stock, or scrip for stock, continued in full force. The defendants had done nothing to terminate it, either by tender and demand of the assessments, or by any proceeding, as for a forfeiture for the non-payment of assessments.
The plaintiff had, therefore, a right to tender the amount of the assessments which had been called for, with interest thereon, and demand his scrip; and for refusing to deliver, the defendants are liable.
The only remaining 'question is, what is the rule of damages ?
The general rule is, that on the breach of an agreement to deliver goods, if the money therefor has not been paid, the measure of damages is the difference between the price and the market value on the day on which the goods should have been delivered. (Dey v. Dox, 9 Wend. 129 ; Davis v. Shields, 24 Wend. 327 ; Mien v. Dykers, 3 Hill, 593, and 7 Hill, 497 ; Beals v. Terry, 2 Sandf. 127 ; Me Knight v. Dunlop, 5 N. Y. R. 544; Billings v. Vanderbeck, 23 Barb. 546.)
This rule is applicable to the present case. The reason on which it rests is apt to the situation of these parties. The presumption is, that with the money in his own hands,the purchaser’ can, on the day the vendor was bound to deliver, purchase■ other like property; and so he has sustained no damage but the enhanced price he is compelled to pay. So here the plaintiff, on the day he demanded the stock, and when presumptively he had need of the stock, could have purchased it at its market value; and his loss would have been, and in judgment of law it was, the difference between the sum it was necessary to pay in the market to buy the stock, and the amount of the assessments and interest which he tendered to the defendants.
A refusal t°o deliver or transfer stock, which is to be paid for, is in strict analogy to the rule governing the sale *538 of chattels, where the price has not been paid. See Allen v. Dykers, supra ; Gray v. Portland Bank (3 Mass. 364).
That in cases where the purchaser has paid his money, and so presumptively has it not' in his power to buy other like goods, &c., on the day when delivery should be made, the rule of damages is the highest market value from the day when delivery should be made, down to the time of the trial, has been repeatedly held in this' State; West v. Wentworth, (3 Cowen, 82 ;) Clark v. Pinney, (7 Id. 681;) Potter v. Hopkins, (25 Wend. 417;) and the like rule was applied to a refusal to permit a transfer of stock which the plaintiff had already bought and paid for. (Kortright v. Com. Bank of Buffalo, 20 Wend. 93, and 22 Wend. 348.) The correctness of this rule has been much questioned, and there is great conflict of authority on the subject. See the subject discussed, and the cases in England and in this country collected, Suydam v. Jenkins (3 Sandf. 614) ; Sedgwick on Dam., ch. 10, 2d ed., pp. 260-275, and notes ; Mayne on Dam., pp. 81-87.
I do not pursue that discqssion, because I think that this case is to be decided upon the rule applicable to nondelivery when the price has not been paid, as above stated; and as to that rule, the authorities are, I think, uniform.
The plaintiff is, however, entitled to interest from the day he demanded the scrip on the difference between the market value and the price he was to pay. The case of Dana v. Fiedler (2 Kern. 41), sustaining the dissenting opinion in the same case (1 E. D. Smith, 483), settles this, and affirms -the rule of damages above stated. See, also, Sedg. and Mayne, above cited, and Suydam v. Jenkins (3 Sandf. 614).
Judgment should, therefore, be entered for the plaintiff for $26,812.50, with interest from January 22d, 1857 (when the scrip should have been delivered), and his costs of suit.
Moncrief and Robertson, J- J., concurred.
Judgment for the plaintiff.