CHARLES W. GILLETT, Exr.

*v.*

THE CHICAGO TITLE AND TRUST COMPANY, Receiver, *et al.*

*Opinion filed October 23, 1907—Rehearing denied Dec. 6, 1907.*

1. CORPORATIONS—*in collecting subscription, directors must obtain money or money's worth.* In collecting subscriptions to the stock of a corporation the law requires the directors to obtain money or money's worth to the full amount of the subscription; and if the directors see fit to accept property in lieu of cash they can only take it at its fair cash market value, or, if it has no ascertainable market value, only at such a price as might be realized by selling the property to others for cash.

2. SAME—*directors must ascertain value of doubtful property.* Where property is offered to the directors of a corporation in payment of a stock subscription, it is the duty of such directors, before accepting it, to ascertain the value of such property precisely in the same manner that they would do if they were about to invest their own money therein, and if they fail to make any investigation whatever and accept practically worthless property, the subscription cannot be held to have been paid.

3. SAME—*rule where the directors make a mistake in accepting property at too high a value.* The rule that a mistake by directors in accepting property at too high a value in payment of a stock subscription cannot be regarded as a fraudulent over-valuation applies only where the transaction constitutes a valid contract of bargain and sale, made in good faith by the directors and in the intelligent exercise of fair and honest judgment on their part, and does not apply to a sham transaction.

4. SAME—*when stock subscription is wholly unpaid.* Where the directors of a corporation, under the domination of the subscriber of practically the entire capital stock of the corporation, accept in payment of such subscription an assignment of the subscriber's rights in a certain play to be written by him and in a number of scenic inventions not perfected nor accurately described, which rights could not, at the time of the transaction, have been transferred for anything of value, such subscription must be regarded as remaining wholly unpaid.

5. SAME—*rule where unpaid stock is issued as "fully paid and non-assessable."* Where stock is issued as "fully paid and non-assessable," one who subsequently acquires it in good faith and without notice that it is not fully paid cannot be held liable if, in fact,

the stock is not fully paid; but "notice," in this connection, means knowledge of the fact that the stock was not fully paid, or knowledge of such facts as would have put an ordinarily prudent person upon inquiry which might reasonably be expected to have revealed the fact that the stock was not fully paid.

. 6. SAME—*what facts sufficient to require inquiry as to whether stock is fully paid.* The facts that a corporation has just been organized, that the stock is being transferred without, or practically without, any consideration, and that the assignees thereof are obtaining it without giving any consideration therefor, are sufficient to put such assignees upon inquiry, notwithstanding the stock purports to be "fully paid and non-assessable."

7. SAME—*when payments by bondholders are not payments on stock.* Where subscribers to the bonds of a corporation also subscribe for stock of the corporation under an agreement that they shall pay the face value of the bonds and receive the bonds and also shares of stock of the corporation to the same amount, if the payments so made amount only to the face value of the bonds they cannot be held to be payments upon the stock, which, under such circumstances, must be treated as a bonus.

8. SAME—*when subscribers are stockholders though they do not take possession of stock.* Where, by the terms of the subscription agreement to the bonds of a corporation, the subscribers, upon payment of the amount subscribed, are to have delivered to them by the trustee the number of bonds subscribed and paid for and also an amount of the capital stock equal, "at its par value, to the par value of the bonds subscribed," such subscribers, upon payment of their subscriptions, become stockholders, as to creditors of the corporation, whether they take actual possession of the bonds or stock or leave them with the trustee.

9. SAME—*when subscribers have no option to refuse to accept stock.* Where, by the terms of the subscription agreement to the bonds of a corporation, the subscribers are under the same obligation to receive the stock of the corporation which is to accompany the bonds as they are to receive the bonds, the subscribers, upon payment of their subscriptions, cannot, as against creditors of the corporation, refuse to accept the stock because it is not fully paid, notwithstanding the agreement provides for the delivery of "fully paid and non-assessable" stock, where, at the time of the bond subscription, none of the stock of the corporation was paid for, and the bond subscribers had notice of that fact or of such facts as should have put them upon inquiry.

10. SAME—*creditor's knowledge of consideration for stock does not work an estoppel.* The fact that a creditor of a corporation

knows, at the time of extending credit, that the stock of the corporation has been issued as "full paid and non-assessable," and knows what consideration was received therefor, does not estop him from proceeding against the stockholders of the corporation upon the ground that the stock is not fully paid. (*Sprague* v. *National Bank of America*, 172 Ill. 149, followed.)

11. SAME—*when interest is allowable only up to time of filing bill.* Where the assets of a corporation, including the stock liability, are less than its indebtedness, and it passes into a court of equity for administration of its assets and for dissolution, claimants, including bondholders, whose claims are interest bearing, are entitled to interest only to the time the bill was filed, unless, after the administration of the fund, there is some party against whom the claimholders can take personal judgment, in which case, as against such party, the claims will draw interest in accordance with the contracts upon which they are based.

12. SAME—*when a party must be deemed owner of stock.* One who receives for services rendered a due bill for a certain number of shares of stock, which he assigns to another person, of no financial responsibility, for a portion of their face value, taking the latter's notes, which authorized the sale of the certificates of stock which were endorsed in blank and deposited with the former as security for the notes, which remain in the greater part unpaid, is properly regarded, as against creditors of the corporation, as the owner of the stock.

13. SAME—*when party will be presumed to be owner of stock.* One to whom a certificate of stock has been issued and who has receipted for the same upon the books of the corporation without indicating in any way that he was other than the absolute owner of the stock, will be presumed, in the absence of definite evidence to the contrary, to be the owner of such stock.

14. MASTERS IN CHANCERY—*exception to legal conclusion of the master is not necessary.* Exceptions to the report of the master in chancery relate only to the master's findings of fact, and the question whether he has drawn an incorrect legal conclusion may be heard and determined without exceptions.

15. BRIEFS—*only one brief should be filed by parties complaining where cases are consolidated.* Where cases are consolidated for hearing in the Supreme Court, but one brief and argument and one reply brief should be filed in behalf of all those complaining of the judgment or decree sought to be reviewed.

16. APPEALS AND ERRORS—*appeal by stockholder does not bring up stockholders not appealing.* An appeal by a stockholder from a decree in a proceeding by creditors to enforce stock liability, and the

assignment of cross-errors in such appeal, do not bring before the court stockholders not appealing or suing out a writ of error and to whom the particular portion of the decree appealed from does not apply.

17. PLEADING—*when a petition to vacate decree does not show due diligence.* A petition to vacate a decree against stockholders for stock liability, upon the grounds that the petitioner had been misled by statements of attorneys for certain creditors to the effect that a decree would not be asked against him, and that he had a good defense to the decree in the form of a discharge in bankruptcy, is open to demurrer, where, from aught that appears in the petition, petitioner's knowledge that a decree would be taken against him was acquired in ample time to have enabled him to make his defense before the decree was entered.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

With this case have been consolidated in this court cases bearing titles and general numbers as follows, to-wit: No. 5339, Weaver v. Chicago Title and Trust Co., Receiver of Columbian Celebration Co. *et al.;* 5370, Weaver v. Same; 5383, Stuart v. Same; 5384, Bodman v. Same; 5385, Brewster v. Same; 5386, DeCamp v. Same; 5387, Hinkley *et al.* v. Same; 5388, Lobdell v. Same; 5389, Maxwell v. Same; 5390, Merchants' Loan and Trust Co. v. Same; 5391, Hately v. Same; 5392, Lyon v. Same; 5393, Butler v. Same; 5394, Cudahy v. Same; 5395, Hinkley v. Same; 5396, Halbert v. Same; 5397, Logan v. Same; 5398, Hinkley v. Same; 5399, Henry v. Same; 5400, Lee v. Same; 5401, McClurg v. Same; 5402, Porter v. Same; 5403, Peck v. Same; 5404, Peck v. Same; 5405, Steenberg v. Same; 5406, Thrall v. Same; 5407, Valentine v. Same; 5408, Deere v. Same; 5409, McNally v. Same; 5410, Knapp v. Same; 5411, Hynes v. Same; 5412, Sickel v. Same; 5413, Berriman v. Same; 5414, Gage v. Same; 5415, Phelps v. Same; 5416, Schmitt v. Same; 5417, Twitchell v. Same; 5418, Taylor v. Same; 5419, Barbour

v. Same; 5420, Frees v. Same; 5421, American Trust and
Savings Bank v. Same; 5422, Ware v. Same; 5423, Randall v. Same; 5424, Sickel v. Same; 5425, Nelson v. Same;
5430, Kirk v. Same.

On June 10, 1893, the Buda Foundry and Manufacturing
Company, an Illinois corporation doing business in the city
of Chicago, filed a bill in the circuit court of Cook county
against the Columbian Celebration Company, a corporation,
and a large number of its stockholders, under section 25 of
chapter 32, Hurd's Revised Statutes, on behalf of itself and
all other creditors of said company, for the appointment of
a receiver, the dissolution of said corporation and the enforcement of stockholders' liability.   Certain other creditors were later joined as co-complainants.   To the bill as
amended a large number of defendants interposed general
demurrers, which, on June 25, 1894, were sustained by the
court and the bill dismissed for want of equity.   An appeal
was taken by the complainant to the Appellate Court for
the First District.   The decree was reversed and the cause
remanded by that court, and on February 15, 1895, was
re-docketed in the said circuit court and the demurrer was
thereafter overruled.   On May 20, 1905, the cause came on
for hearing upon the amended bill, the answers of a large
number of defendants and the replications thereto, the report and supplemental report of the master made in accordance with orders of reference theretofore entered, and
the exceptions filed thereto, and on that day a decree was
entered by the court which finds, among other things, that
during the latter part of the year 1891 Steele MacKaye,
who was at that time a playwright and who was a man
of small means, conceived the project of producing a spectacular show or panorama at Chicago during the World's
Columbian Exposition, which panorama should exhibit on a
life-like scale the discovery of America by Columbus; that
said MacKaye planned that he would write a story of said
panorama and construct an enormous building near the ex-

position grounds, in the said city, in which to give said
exhibition, and he proposed to invent certain devices which
would be improvements in the methods of scene shifting and
in the production of realistic spectacular performances and
to use said devices and improvements in said building; that
for the purpose of carrying out said project said MacKaye
joined with him, as promoters of the scheme, Benjamin But-
terworth and Powel Crosley, and secured the services of
defendant William L. B. Jenney, an architect of Chicago,
who was to work out MacKaye's ideas and put them into
practical form; that on January 13, 1892, the said three
promoters obtained a charter from the Secretary of State
of the State of Illinois for a corporation called "The Spec-
tatoria Company," with an authorized capital stock of
$100,000, consisting of 1000 shares of the par value of $100
each; that said stock was subscribed for as follows, to-wit:
Steele MacKaye 998 shares, Powel Crosley one share and
Lewis H. Utz one share, and that said three subscribers
formed the first board of directors of said corporation; that
at the time of the incorporation of said company the said
promoters planned that they would procure patents on Mac-
Kaye's proposed stage improvements, and when so procured
they would turn over said patents to said Spectatoria Com-
pany as pretended payments for the capital stock of said
corporation subscribed for by MacKaye and would then di-
vide the said stock among themselves; that shortly there-
after the said promoters decided that they would organize
a second corporation, with a capital stock of $2,000,000,
and that MacKaye should subscribe for all of said stock
with the exception of four shares, and should pretend to
pay for the same by transferring to said corporation the
right to use for a limited time in a limited territory all of
said MacKaye's inventions and letters patent which might
thereafter be issued on said inventions, subject, however, to
a royalty of ten per cent on the gross receipts secured by
said second corporation from the use of said inventions and

patents, which should be paid daily to MacKaye; that said promoters planned that said inventions, and the patents to be issued thereon, and the right to said royalty, should be transferred by said MacKaye to the aforesaid Spectatoria Company, subject to the right of the said second corporation to use said patents as hereinbefore mentioned; that said promoters planned to procure money to secure a site and construct a building thereon by having said second corporation issue and sell $800,000 of bonds secured by a first mortgage on the said site, building and patents; that in order to facilitate the sale of said bonds the said promoters proposed that MacKaye should turn back to said second corporation $800,000 of the capital stock of said corporation when received by him, which stock should be issued by said corporation as bonus for bonds to be sold; that in order to start and carry out said plan, Butterworth and MacKaye, in 1892, secured loans of several thousand dollars from defendants Edward B. Butler and Egbert W. Gillett, severally, and through them secured the co-operation of defendants J. Foster Rhodes, Henry E. Weaver, Bernard A. Eckhart and Edward L. Brewster in promoting said plan, and gave to the most of them stock in the Spectatoria Company and promised each of them stock in the new corporation in return for their assistance, and that with the money so raised a miniature model of the proposed stage and proposed panorama was constructed from the plans drawn by defendant Jenney and was exhibited in the early months of 1892 in a room secured by the promoters in the Auditorium Hotel, in Chicago; that a large proportion of the defendants visited the model show and listened to lectures by MacKaye, in which he explained the enterprise and the plan for financing the same.

The court further finds that in pursuance of said plan, on May 6, 1892, the Columbian Celebration Company was incorporated, with a capital stock of $2,000,000, divided into 20,000 shares of the par value of $100 each; that said

MacKaye subscribed for 19,996 shares of said stock, and defendants Sidney C. White, Jr., Howard O. Edmonds, Powel Crosley and Benjamin Butterworth one share each, and that said five men constituted the first board of directors of said corporation; that thereafter, on May 16, 1892, at the first meeting of said directors a contract was entered into between MacKaye and the said corporation, by which MacKaye, in consideration of the payment to him of 19,996 shares of the capital stock of said company, full paid and non-assessable, and the payment to him of said royalty, as heretofore planned, assigned to said company the right to use his said inventions and the manuscript which he would prepare, for a term of fifteen years, in certain States; that thereafter, on May 21, 1892, said MacKaye assigned to said Spectatoria Company, in consideration of the 998 shares of said stock issued to him, his right to said ten per cent royalty and all rights in his patents and inventions heretofore mentioned, subject only to the use of the same by the Columbian Celebration Company, as hereinbefore mentioned; that on the same day the said Columbian Celebration Company issued its entire capital stock in five stock certificates, all marked "full paid and non-assessable," as follows: Certificate No. 1 to Steele MacKaye for 19,996 shares, and certificates numbered 2, 3, 4 and 5, for one share each, to Butterworth, White, Jr., Edmonds and Crosley; that on the same day or the day following, MacKaye returned certificate No. 1 to said corporation, with his endorsement thereon, directing the transfer of 1574 shares of said stock, each, to Butterworth and Crosley and the re-issue to himself of 7349 shares of said stock, and at the same time MacKaye permitted his clerk to endorse on said certificate a direction to re-issue 9499 shares of said stock to be held by said company "for promotion;" that at the time of the issuance of such stock no applications had been made by said MacKaye for letters patent, and that the sole assets of the company consisted of claimed devices and inventions not yet devel-

oped and untested; that the pretended transfer of said alleged patents to said corporation and the issuing by said corporation to MacKaye of all but four shares of its capital stock was a trade made by MacKaye with himself and for the sole benefit of himself and his two co-promoters, and was a fraud upon all such persons who might thereafter become creditors of said company; that in such exchange there was no honest exercise of judgment on the part of said directors as to the value of said inventions, and that it was a fraudulent scheme of MacKaye, Butterworth and Crosley to obtain possession of said stock without paying anything of known value therefor; that said designs and inventions were without practical form and were undeveloped ideas existing in the brain of MacKaye; that neither on May 21, 1892, nor at any time before or since, was any money or property of any value paid to said company for said stock on account of the subscription therefor or for the re-issue thereof, with the exception of 250 shares re-issued to defendants E. A. and C. B. Shedd. No question relative to the Shedd stock is presented in this court.

The decree further finds that at a meeting of the officers of said company on May 17, 1892, it was decided to raise, if possible, $800,000 to develop the project, and a resolution was passed authorizing the president to procure a series of first mortgage bonds of the denomination of $1000, to be numbered consecutively from 1 to 800, bearing interest at the rate of seven per cent per annum, and to be secured by a deed of trust to be made by the Columbian Celebration Company to the American Trust and Savings Bank as trustee, upon all the property, of every description, acquired or that might thereafter be acquired by said company, and the president was directed and authorized to take any and all measures necessary to properly negotiate the aforesaid bonds and to secure the capital necessary for the business of the said company; that in order to facilitate the sale of said bonds said MacKaye contributed to said corporation 8000

shares of its capital stock, which were a part of the 9499 shares heretofore mentioned, to be used, and which were used, as a bonus to induce persons to subscribe to the said bonds, and that on July 6, 1892, a subscription for the amount of said bonds was offered to the public, which was as follows:                                    "CHICAGO, *July 6, 1892.*

"We, the undersigned, hereby subscribe for the number of the first mortgage bonds of the Columbian Celebration Company, of $1000 each, set opposite our names, respectively, as hereunder written, subject, however, to the following conditions:

"*First*—No subscription shall be binding until the good and valid subscriptions hereunder written amount to five hundred thousand ($500,000) dollars.

"*Second*—Before any subscription shall be binding there shall be deposited with the American Trust and Savings Bank, as trustee, $800,000 of the capital stock of the Columbian Celebration Company, full paid and non-assessable, said stock to be held by said trustee to be delivered to the subscribers to said bonds, as follows: Each subscriber, on the full and final payment to the aforesaid trustee of the amount subscribed for by him according to the terms of his subscription, shall be entitled to receive, and the said trustee shall deliver to said subscriber, the number of bonds subscribed and paid for by him, and in addition thereto an amount of the capital stock of the Columbian Celebration Company equal, at its par value, to the par value of the bonds subscribed and fully paid for by such subscriber.

"The subscriptions shall be paid for in not less than five installments, the first within ten days after the subscriptions become binding according to the terms hereof, the others as the board of directors may determine, provided that thirty days shall elapse after each call before another call is made."

—that between July 6 and August 26, 1892, subscriptions were signed for over $500,000 worth of said bonds, and on the last mentioned date the said company notified the American Trust and Savings Bank, in writing, that it proposed to issue its said bonds to the amount of $800,000; that the directors had, by resolution, selected said bank as trustee for the subscribers to said bonds, and that over $500,000 of said subscriptions had been received by said company on the conditions set forth in the subscription agreement, a copy of which was annexed to said notice, and that in accordance

with the said agreement it delivered to said American Trust and Savings Bank 8000 shares of the capital stock of said company of the par value of $800,000; that the shares so delivered were the shares which MacKaye had contributed to said corporation and were part of the 9499 shares turned back to said company by him "for promotion," and were represented by stock certificate No. 46, made out in the name of the American Trust and Savings Bank, trustee; that the certificate states, on its face, that said shares were fully paid and non-assessable; that on September 9, 1892, a resolution was passed by said company and delivered to said bank, which first set out a copy of the subscription contract and then gave certain directions as to the delivery of said stock and bonds, which were as follows:

"1. Whenever and as often as any such subscriber presents to said trustee the certificate of the secretary of this company that he has paid to the treasurer of this company the full amount of his subscription, the trustee shall deliver to said subscriber the number of bonds, of the par value of $1000 each, subscribed for by him, and in addition thereto shares of the capital stock of the company equal in par value to the amount of the said bonds, taking a receipt therefor.

"2. Every subscriber to said bonds shall be entitled to and shall receive interest at the rate of seven percentum (7%) per annum upon the amount and from the date of each payment made by him upon his subscription to said bonds, and as the first maturing coupon attached to each of said bonds includes interest from a date prior to the date of such payments, before the delivery of the bonds to the subscribers there shall be endorsed in red ink on the face of such coupon, as having been paid thereon, the amount of interest which has accrued on the bonds prior to the date of the payment, or the average date of the payments made by the subscribers to the bonds.

"3. The trustee shall report to the secretary the date of the delivery of said bonds; the number of bonds delivered;

the names of the persons to whom they are delivered; the amount of accrued interest endorsed upon each of said first maturing coupons. The secretary is directed to certify a copy of this resolution to accompany the mortgage or deed of trust."

—that on September 20, 1892, 800 of the said bonds were delivered to said bank, and on the same day the said trust deed hereinbefore referred to was executed and delivered to said trustee; that as payments for bonds were made by the subscriber to said company the trustee sent back to the company the certificate for shares of stock standing in the name of the American Trust and Savings Bank, trustee, endorsed in blank, and asking for a re-issue of the shares thereby represented in two or more certificates, one to be issued in the name of and delivered to the subscriber for bonds in the amount equivalent to his bond purchase, and the other for the remainder of the 8000 shares to be issued in the name of and delivered to the trustee, as aforesaid, and the stock was thereafter so re-issued from time to time, as requested; that at the time of the filing of the bill herein the said American Trust and Savings Bank, as trustee, had in its possession a large number of the shares of the stock which had been turned over to it as trustee and which had not been delivered to any of the subscribers for bonds, a part of which was held for such subscribers as had paid for said bonds and the balance in trust for said company; that the said savings bank acted merely in the capacity of trustee, and had never subscribed for or in any way become the owner of any of the said stock.

The decree further finds that the said 8000 shares of stock so delivered to said savings bank, as trustee, were put back into the treasury of the company by MacKaye without anything being paid for the original issue or its return, and that the bond subscribers, on receiving such bonus stock or upon becoming either the legal or equitable owners thereof, became liable for the amount unpaid thereon; that each of

the subscribers to said bonds was put upon inquiry as to the character of the stock and the right of the corporation to dispose of it at less than its face value, and that each and every one of such subscribers was informed of the way said stock was purported to have been paid for by said MacKaye; that after the said company had raised the sum of $500,000 from the sale of said bonds it proceeded to secure a site and begin the construction of buildings and machinery, and secured contracts with a large number of singers and actors, and expended the said sum of $500,000, and contracted obligations, in addition thereto, to an amount exceeding $300,000; that afterwards an unsuccessful attempt was made to sell the remaining portion of said $800,000 bond issue, and about May 31, 1893, on account of its liabilities the company was forced to cease to do business, and on that date said MacKaye filed a bill against the Columbian Celebration Company, under which the Chicago Title and Trust Company was made receiver of said corporation and took possession of all its assets, which consisted chiefly of the above mentioned unfinished building on leased ground, and that since that date the same has been converted into cash and there is now the sum of $1400 in the hands of the receiver.

The decree further finds that the proceedings taken under the said bill filed by said MacKaye were taken for the purpose of delaying and hindering creditors in the collection of their claims and not for the purpose of winding up said corporation, and that said bill was an imposition on the court and gave it no jurisdiction to grant relief or appoint such receiver thereunder, and that such appointment was invalid; that on October 14, 1895, the court, of its own motion, ordered that the case of said MacKaye against the Columbian Celebration Company should be and was consolidated with this case, and appointed the said Chicago Title and Trust Company receiver of said Columbian Celebration Company in this case without prejudice to the claim of the Buda Foundry and Manufacturing Company, and that on

230 — 25

said last mentioned date the bill of said MacKaye was dismissed on motion of complainant; that on April 13, 1896, an order was entered herein directing the said receiver to notify all the creditors of said company to file and prove up their claims, and in pursuance of such order and notice claims for labor and material to the amount of $328,986.64 were filed and allowed, among which was the claim of the Buda Foundry and Manufacturing Company for $9378, and also the claim of the First National Bank of Chicago for $1386.29; that in addition to the foregoing, the parties whose names appear in "Table of bondholders No. 1," hereinafter set out, proved up before the master their first mortgage bonds in the number of bonds set out in column 2 and of the face value set out in column 3; that each of said bonds was dated August 25, 1892, payable January 1, 1894, and bore interest at the rate of seven per cent per annum after date, as evidenced by two coupons, one for $60, payable July 1, 1893, and the other for $35, payable January 1, 1894, attached to each bond; that all of said bondholders paid their subscriptions to said bonds on or about the date when the installments thereof became due, and that said bonds were delivered by the Columbian Celebration Company to said trust and savings bank, trustee, and were delivered by it to said subscribers; that said bank certified on all coupons maturing July 1, 1893, what sum each of said July coupons should be good for; that the sums so certified on said coupons are set out in column 4 of "Table of bondholders No. 1" after the names of said bondholders; that said bondholders accepted said bonds with said coupons attached and so certified and acknowledged, the amount so certified to be the amount which should be paid; that interest should not be allowed on any of said bonds subsequent to June 10, 1893, (the date of filing this bill,) and that interest at the rate of seven per cent per annum on the full value of each of said bonds from June 10, 1893, to July 1, 1893, should be deducted from the balance due on said cou-

pons maturing July 1 as said balance was certified by said bank; that the amount set out in said column 5 of "Table of bondholders No. 1" is the amount allowed by the court to said bondholders for interest on said bonds to June 10, 1893, and that the amount set out in column 6 is the total amount of principal and interest allowed by the decree to said bondholders; that the claim of each of said bondholders to the amount as set out in said column 6 is allowed, but payment shall be made on said claims only as hereinafter decreed:

TABLE OF BONDHOLDERS No. 1.

| Column 1<br>NAMES OF OWNERS | Column 2<br>Number of<br>Bonds | Column 3<br>Face<br>Value of<br>Bonds | Column 4<br>Int. Due<br>on July<br>Coupon | Column 5<br>Total<br>Interest<br>Allowed | Column 6<br>Total<br>Claim<br>Allowed |
|---|---|---|---|---|---|
| Luther W. Bodman | 5 | $5,000 | $168.50 | $149.05 | $5,149.05 |
| Edwin R. Baker | 2 | 2,000 | 51.50 | 41.72 | 2,041.72 |
| Edward B. Butler | 4 | 4,000 | 132.80 | 117.25 | 4,117.25 |
| Edward L. Brewster | 5 | 5,000 | 152.25 | 132.81 | 5,132.81 |
| Herbert E. Bucklen | 10 | 10,000 | 326.50 | 287.62 | 10,287.62 |
| Percy L. Brabon | 1 | 1,000 | 31.85 | 27.96 | 1,027.96 |
| John H. Bradshaw | 5 | 5,000 | 157.50 | 138.06 | 5,138.06 |
| George S. Baker | 1 | 1,000 | 27.50 | 25.61 | 1,025.61 |
| John Cudahy | 10 | 10,000 | 325.50 | 286.62 | 10,286.62 |
| Arthur Dixon | 5 | 5,000 | 150.50 | 131.06 | 5,131.06 |
| Herbert C. DeCamp | 1 | 1,000 | 33.90 | 30.01 | 1,030.01 |
| Bernard A. Eckhart | 5 | 5,000 | 152.50 | 133.06 | 5,133.06 |
| Patrick J. Farley | 1 | 1,000 | 38.25 | 34.36 | 1,034.36 |
| Northern Trust Co., executor of estate of George A. Fuller, deceased | 3 | 3,000 | 101.10 | 89.44 | 3,089.44 |
| Merchants' Loan and Trust Co., administrator of estate of Charles W. Fullerton, deceased | 5 | 5,000 | 166.75 | 147.30 | 5,147.30 |
| Henry C. Gray | 5 | 5,000 | 172.00 | 152.56 | 5,152.56 |
| Franklin D. Gray | 5 | 5,000 | 162.50 | 143.06 | 5,143.06 |
| Charles W. Gillett, executor of last will and testament of Egbert W. Gillett, deceased | 5 | 5,000 | 104.00 | 84.56 | 5,084.56 |
| James O. Hinkley | 5 | 5,000 | 162.50 | 143.06 | 5,143.06 |
| Charles W. Hinkley | 2 | 2,000 | 64.00 | 56.22 | 2,056.22 |
| Charles W. Hinkley and James Otis Hinkley, executors of the last will and testament of Watson S. Hinkley, deceased | 5 | 5,000 | 155.50 | 136.06 | 5,136.06 |
| Robert L. Henry | 2 | 2,000 | 64.40 | 56.62 | 2,056.62 |
| Homer V. Halbert | 2 | 2,000 | 64.00 | 56.22 | 2,056.22 |
| John C. Hately | 2 | 2,000 | 66.10 | 58.32 | 2,058.32 |
| Jennie L. Thomas and Florence H. Purdie, administratrices of estate of George W. Hoffman, deceased | 5 | 5,000 | 169.00 | 149.56 | 5,149.56 |
| William J. Hynes | 3 | 3,000 | 98.40 | 86.74 | 3,086.74 |
| Franklin H. Head | 5 | 5,000 | 154.50 | 135.06 | 5,135.06 |
| William L. B. Jenney | 5 | 5,000 | 133.00 | 113.55 | 5,113.55 |
| Milton W. Kirk | 5 | 5,000 | 163.00 | 143.56 | 5,143.56 |
| Edson Keith estate | 10 | 10,000 | 318.00 | 278.12 | 10,278.12 |
| Augustus I. Lewis | 2 | 2,000 | 113.00 | 48.82 | 2,048.82 |
| Edwin L. Lobdell | 5 | 5,000 | 151.50 | 132.06 | 5,132.06 |
| William H. Lee | 2 | 2,000 | 53.00 | 45.22 | 2,045.22 |
| Frank G. Logan | 5 | 5,000 | 172.50 | 153.06 | 5,153.06 |
| John Frank Lyon | 1 | 1,000 | 32.40 | 28.57 | 1,028.57 |
| Richard S. Lyon | 3 | 3,000 | 99.00 | 87.34 | 3,087.34 |
| Charles E. Maxwell | 2 | 2,000 | 64.10 | 56.32 | 2,056.32 |
| Franklin W. Morgan | 1 | 1,000 | 33.00 | 29.11 | 1,029.11 |

TABLE OF BONDHOLDERS No. 1.—*Continued.*

| Column 1<br><br>NAMES OF OWNERS | Column 2<br>Number of<br>Bonds | Column 3<br>Face<br>Value of<br>Bonds | Column 4<br>Int. Due<br>on July<br>Coupon | Column 5<br>Total<br>Interest<br>Allowed | Column 6<br>Total<br>Claim<br>Allowed |
|---|---|---|---|---|---|
| Eleanor W. McClurg, administratrix of estate of Alexander C. McClurg, deceased .. | 2 | $2,000 | $64.60 | $56.82 | $2,056.82 |
| Eleanor W. McClurg................... | 3 | 3,000 | 96.90 | 85 23 | 3,085,23 |
| Daniel T. Nelson..................... | 2 | 2,000 | 67.20 | 59.42 | 2,059.42 |
| Augustus E. Perlewitz................ | 1 | 1,000 | 30.70 | 26.81 | 1,026.81 |
| William R. Patterson................. | 1 | 1,000 | 32.75 | 28.86 | 1,028.86 |
| James W. Porter...................... | 5 | 5,000 | 174.50 | 155.05 | 5,155.05 |
| Wm. R. Linn, Sara Phelps and Edward B. Butler, executors of the last will and testament of Elliott H. Phelps, deceased..... | 5 | 5,000 | 168.50 | 149.05 | 5,149.05 |
| Clarence I. Peck..................... | 5 | 5,000 | 164.00 | 144.56 | 5,144.56 |
| Ferdinand W. Peck ................... | 5 | 5,000 | 164.00 | 144.56 | 5,144.56 |
| Norman B. Ream and Robert T. Lincoln, executors of the last will and testament of George M. Pullman, deceased............. | 50 | 50,000 | 1,645.00 | 1,450.60 | 51,450.60 |
| Curtis H. Remy ...................... | 5 | 5,000 | 170.75 | 151.31 | 5,151.31 |
| Mary E. Randall, administratrix of the estate of Charles W. Randall, deceased..... | 2 | 2,000 | 67.50 | 59.72 | 2,059.72 |
| J. Foster Rhodes..................... | 2 | 2,000 | 91.50 | 83.33 | 2,083.33 |
| Mrs. Hugh A. Rowland................. | 3 | 3,000 | 100.80 | 99.14 | 3,099.14 |
| Norman B. Ream...................... | 5 | 5,000 | 161.25 | 141.81 | 5,141.81 |
| John T. Sickel....................... | 3 | 3,000 | 102.90 | 91.23 | 3,091.23 |
| E. A. & C. B. Shedd.................. | 50 | 50,000 | 3,000.00 | 2,785.83 | 52,785.83 |
| Anthony Schmitt..................... | 3 | 3,000 | 102.90 | 91.23 | 3,091.24 |
| Mrs. Sara Steenberg................. | 1 | 1,000 | 32.70 | 28.82 | 1,028.82 |
| Mrs. Louise A. Stever, (formerly Louise A. Barnum)............................. | 1 | 1,000 | 34.00 | 30.11 | 1,030.11 |
| Robert Stuart ....................... | 5 | 5,000 | 160.00 | 140.56 | 5,140.56 |
| Albert L. Tucker..................... | 1 | 1,000 | 32.20 | 28.31 | 1,028.31 |
| James O. Twitchell................... | 1 | 1,000 | 32.20 | 28.31 | 1,028.31 |
| William A. Thrall................... | 2 | 2,000 | 67.30 | 59.52 | 2,059.52 |
| William G. Talcott.................. | 1 | 1,000 | 32.40 | 28.51 | 1,028.51 |
| W. J. Taylor......................... | 1 | 1,000 | 37.40 | 33.51 | 1,033.51 |
| Mary A. Tuttle, Edward F. Gorton, John H. Whittemore, Howard B. Tuttle and Arthur H. Dayton, executors of the last will and testament of Bronson B. Tuttle, deceased.. | 5 | 5,000 | 112.50 | 93.06 | 5,093.06 |
| Alastair I. Valentine................ | 3 | 3,000 | 100.20 | 88.54 | 3,088.54 |
| John H. Whittemore ................. | 5 | 5,000 | 250.00 | 230.25 | 5,230.25 |
| James N. Witherell ................. | 5 | 5,000 | 135.75 | 116.31 | 5,116.31 |
| Flora M. Young, executrix of last will and testament of John M. Young, deceased.... | 2 | 2,000 | 62.60 | 54.82 | 2,054.82 |

The court further finds that in addition to the bondholders whose names are contained in the above table, the parties whose names appear in "Table of bondholders No. 2," hereinafter set out, are the owners of first mortgage bonds in the number set out in column 2 of said table and of the face value as shown by column 3; that each of said bonds is dated August 25, 1892, and was payable January 1, 1894, and bore interest at the rate of seven per cent per annum after date; that said persons whose names are set out in said table paid for the bonds for which they had sev-

erally subscribed but failed and refused to take said bonds from said trustee, although entitled to do so; that the said trustee did not certify on the coupons attached to said bonds and maturing July 1, 1893, the amount for which said bonds should be good, but that said parties are entitled to interest at the rate of seven per cent per annum from the date when payments were made for their several bonds, up to June 10, 1893; that said interest to which each of said bondholders is entitled is set out in column 4 and the total amount of principal and interest to which each bondholder is entitled is set out in column 5 of said table opposite their respective names, and that the claim of each of said bondholders is allowed for the amount set out in said column but that payment on said claims shall be subject to conditions hereinafter imposed:

TABLE OF BONDHOLDERS No. 2.

| Column 1<br><br>NAMES OF OWNERS | Column 2<br>No. of<br>Bonds | Column 3<br>Face<br>Value | Column 4<br><br>Interest | Column 5<br>Total<br>Allowed |
|---|---|---|---|---|
| Edward C. Berriman | 3 | $3,000 | $90.09 | $3,090.09 |
| Caroline A. Barbour, administratrix of estate of Edward Barbour, deceased | 2 | 2,000 | 54.81 | 2,054.81 |
| Charles H. Deere | 5 | 5,000 | 141.95 | 5,141.95 |
| Benjamin M. Frees | 1 | 1,000 | 28.82 | 1,028.88 |
| Victor Falkenan | 5 | 5,000 | 112.88 | 5,112.82 |
| Lyman J. Gage | 10 | 10,000 | 231.96 | 10,231.96 |
| Henry H. Getty | 5 | 5,000 | 150.30 | 5,150.30 |
| Charles L. Hutchinson | 5 | 5,000 | 145.35 | 5,145.35 |
| William Kent | 5 | 5,000 | 142.15 | 5,142.15 |
| Frederick G. McNally and Harry B. Clow, executors of last will and testament of Andrew McNally, deceased | 5 | 5,000 | 147.77 | 5,147.77 |
| Murry Nelson | 10 | 10,000 | 179.87 | 10,179.87 |
| Albert J. Oehring | 2 | 2,000 | 51.36 | 2,051.36 |
| William R. Page | 5 | 5,000 | 129.79 | 5,129.79 |
| John T. Shayne | 2 | 2,000 | 40.73 | 2,040.73 |
| Wilbur F. Studebaker, William R. Innis and Nelson J. Reilly, executors of the last will and testament of Peter E. Studebaker, deceased | 5 | 5,000 | 82.40 | 5,082.40 |
| Richard T. Whelpley | 5 | 5,000 | 170.33 | 5,170.33 |
| Louis C. Wachsmuth | 5 | 5,000 | 143.60 | 5,143.60 |
| Henry E. Weaver | 5 | 5,000 | 123.76 | 5,123.76 |

The court orders and decrees that as soon as each bondholder whose name appears in the above tables shall have paid to the said receiver such sum as this court shall assess

against him by reason of the fact that such bondholder was or is the owner, holder, transferrer, assignor or assignee of unpaid stock in said company, then, and not till then, shall said bondholder be entitled and shall share *pro rata* with all other creditors of said company in such fund as shall be collected by the receiver and in the assets now in his possession, in the proportion that the amount of the claim of said bondholder shall bear to the total amount of all claims herein allowed; that said bondholders shall not set off their claims as bondholders against their liability as stockholders; and the court finds that the claims allowed herein exceed the total amount of stock, at its par value, which is or has been held by stockholders over whom this court has jurisdiction; that all of the capital stock of said company is unpaid, and that it is necessary to require all stockholders to pay the sum of $100 on each share of stock held by them.

The court further finds that the defendants whose names appear in the following table of stockholders were among those who signed the subscription for bonds of said company; that they subscribed for the number of bonds set opposite their names in column 2 and paid for said bonds in full; that prior to such payment the said company had deposited with said trustee the number of bonds so subscribed for and a number of shares of the capital stock of said company of the par value of $100 per share, equal in par value to the par value of said bonds; that at the time of the payment by defendants for said bonds the trustee delivered to defendants the number of bonds set out in column 2 and the number of shares of the capital stock of said company as set out in column 3, and that said defendants are still the holders of said stock and that all of said stock is entirely unpaid; that the several defendants are liable thereon, as holders, for the full face value thereof to the amount as set out in column 4:

TABLE OF STOCKHOLDERS No. 1.

| Column 1<br>NAMES | Column 2<br>Number of Bonds | Column 3<br>Number of Shares | Column 4<br>Amount of Liability.<br>Face Value of Stock |
|---|---|---|---|
| Edwin R. Baker | 2 | 20 | $2,000 |
| Percy L. Brabon | 1 | 10 | 1,000 |
| Herbert E. Bucklen | 10 | 100 | 10,000 |
| John H. Bradshaw | 5 | 50 | 5,000 |
| George S. Baker | 1 | 10 | 1,000 |
| John Cudahy | 10 | 100 | 10,000 |
| Arthur Dixon | 5 | 50 | 5,000 |
| Bernard A. Eckhart | 5 | 50 | 5,000 |
| Patrick J. Farley | 1 | 10 | 1,000 |
| Franklin D. Gray | 1 | 50 | 5,000 |
| Homer V. Halbert | 2 | 20 | 2,000 |
| John C. Hately | 2 | 20 | 2,000 |
| Charles W. Hinkley | 2 | 20 | 2,000 |
| James O. Hinkley | 5 | 50 | 5,000 |
| William J. Haynes | 3 | 30 | 3,000 |
| Robert L. Henry | 2 | 20 | 2,000 |
| W. L. B. Jenney | 5 | 50 | 5,000 |
| Milton W. Kirk | 5 | 50 | 5,000 |
| William H. Lee | 2 | 20 | 2,000 |
| Frank G. Logan | 5 | 50 | 5,000 |
| Augustus I. Lewis | 2 | 20 | 2,000 |
| Charles E. Maxwell | 2 | 20 | 2,000 |
| Franklin W. Morgan | 1 | 10 | 1,000 |
| Daniel T. Nelson | 2 | 20 | 2,000 |
| William R. Patterson | 1 | 10 | 1,000 |
| Clarence I. Peck | 5 | 50 | 5,000 |
| Ferdinand W. Peck | 5 | 50 | 5,000 |
| Augustus E. Perlewitz | 1 | 10 | 1,000 |
| James W. Porter | 5 | 50 | 5,000 |
| Norman B. Ream | 5 | 50 | 5,000 |
| Mrs. Hugh A. Rowland | 3 | 30 | 3,000 |
| Curtis H. Remy | 5 | 50 | 5,000 |
| Anthony Schmitt | 6 | 60 | 6,000 |
| Louise A. Stever, formerly Louise A. Barnum | 1 | 10 | 1,000 |
| Mrs. Sara Steenberg | 1 | 10 | 1,000 |
| Robert Stuart | 5 | 50 | 5,000 |
| William A. Thrall | 2 | 20 | 2,000 |
| Albert L. Tucker | 1 | 10 | 1,000 |
| William G. Talcott | 1 | 10 | 1,000 |
| W. J. Taylor | 1 | 10 | 1,000 |
| James O. Twitchell | 1 | 10 | 1,000 |
| Alastair I. Valentine | 3 | 30 | 3,000 |
| John H. Whittemore | 5 | 50 | 5,000 |
| Richard T. Whelpley | 5 | 50 | 5,000 |

The decree further finds that among the parties who signed the aforesaid subscription to bonds of said company were the defendants whose names are set out in the following stockholders' table No. 2; that the said defendants subscribed for bonds in number as set out in column 2 opposite their respective names, and that said bonds were of the par value of $1000 each; that they paid for said bonds in full and received the same, and became entitled to receive ten shares of the capital stock of said company, of the par value of $100 per share, with each bond; that said shares had

theretofore been deposited with the said trustee to be held for said subscribers, as provided by the terms of said subscription agreement; that each of said defendants became the owner of the number of shares of said stock set opposite his name in column 3 of said table, and that said defendants have declined and failed to take said shares of stock so owned by them from said trustee, and that said shares are still held by it for said defendants and are all unpaid; that each of said defendants is liable for the par value of said stock; that the amount for which each of said stockholders is liable is set opposite his name in column 4 of said stockholders' table No. 2:

TABLE OF STOCKHOLDERS No. 2.

| Column 1<br>NAMES | Column 2<br>Number of Bonds | Column 3<br>Number of Shares | Column 4<br>Amount of Liability |
|---|---|---|---|
| Charles H. Deere. | 5 | 50 | $5,000 |
| N. E. Dawson. | 3 | 30 | 3,000 |
| Edward L. Brewster. | 5 | 50 | 5,000 |
| Edwin L. Lobdell | 5 | 50 | 5,000 |
| James N. Witherell | 5 | 50 | 5,000 |
| Louis C. Wachsmuth. | 5 | 50 | 5,000 |

The decree further finds that the parties whose names are found in stockholders' table No. 3, hereinafter set out, subscribed for the number of bonds, of the par value of $1000 each, set opposite their names in column 2 of said table; that said parties paid for said bonds in full and became entitled to receive them, and also ten shares of said stock with each of said bonds; that said bonds and shares of stock had been deposited with the said trustee in conformity with the terms of said subscription agreement, and at the time of said payment were held in trust for said parties and said company, as provided in said agreement; that defendants became the owners of such stock and bonds in the number of bonds and shares of stock of the par value as shown by columns 2, 3 and 4 of said table 3; that said shares of stock are each and all unpaid, and that said defendants are liable to the creditors of said company for the

face value thereof; that at the time such payments were
made by said defendants the said company was insolvent,
and that such defendants declined or failed to take either
said bonds or stock so held for them by said trustee, but that
the said defendants had incurred liability on said stock and
could not and did not rescind their contract for such stock;
that each of said defendants is chargeable for his *pro rata*
share of the debts of said company to the extent of $100 per
share of stock so owned by him, the amount of such liabil-
ity being set out in column 4 of said table:

TABLE OF STOCKHOLDERS No. 3.

| Column 1 NAMES | Column 2 Number of Bonds | Column 3 Number of Shares | Column 4 Par Value of Stock. Amount of Liability |
|---|---|---|---|
| Herbert C. DeCamp | 1 | 10 | $1,000 |
| Benjamin M. Frees | 1 | 10 | 1,000 |
| Victor Falkenau | 5 | 50 | 5,000 |
| Lyman J. Gage | 10 | 100 | 10,000 |
| Henry H. Getty | 5 | 50 | 5,000 |
| Edward C. Berriman | 3 | 30 | 3,000 |
| Charles L. Hutchinson | 5 | 50 | 5,000 |
| William Kent | 5 | 50 | 5,000 |
| Murry Nelson | 10 | 100 | 10,000 |
| Albert J. Oehring | 2 | 20 | 2,000 |
| William R. Page | 5 | 50 | 5,000 |
| John T. Shayne | 2 | 20 | 2,000 |
| Henry E. Weaver | 5 | 50 | 5,000 |

The decree further finds that each of the said stockhold-
ers whose names are set out in the foregoing stockholders'
tables is chargeable for his or her *pro rata* share of the debts
of said company to the extent of $100 per share, and it is
ordered and decreed that each of said defendants shall pay,
within thirty days from the date of the entry of this decree,
to said receiver, the amount set opposite his or her name in
said column 4, and upon such payment, or upon payment
after said thirty days, with interest from such time at five
per cent per annum, said receiver is directed to execute and
deliver to said parties a receipt for said moneys and a full
release of any and all liability to said company or its credit-
ors on account of the holding of said shares of stock, and
if payment be not made within thirty days from the date of
the entry of this decree the said defendants shall be charged

with interest at the rate of five percentum per annum after such time.

The decree further finds that since the commencement of this suit, and prior to its submission to the court for its decision, certain of the defendant bondholders not mentioned in either of the foregoing stockholders' tables departed this life; that their deaths have been suggested of record, and that certain persons or companies, as executors or administrators, have been substituted in the place of the persons so deceased; that said persons, prior to their decease, were the owners of a certain number of bonds and a certain amount of said stock which was unpaid, and it is ordered and decreed that said executors or administrators pay the amounts due from the estates of said persons for such unpaid stock to said receiver in due course of administration, in the same manner as hereinbefore provided as to other stockholders. Among such persons so deceased are the following: George M. Pullman, Edson Keith, Watson S. Hinkley, Alexander C. McClurg and Charles W. Fullerton.

The decree further finds that the appellant Lyman Ware signed said subscription for two of the said bonds of said company and subsequently paid the sum of $2000 for the same; that he received from said trustee two bonds and certificate No. 93 for 20 shares of said stock, and that such stock was a portion of the said 8000 shares deposited with said trustee; that said Ware endorsed said certificates and directed said company to re-issue said stock in two certificates of 10 shares each, one to be issued in his own name and the other to J. Foster Rhodes; that said certificates were so issued and delivered, being certificates numbered 101 and 102, to Rhodes and Ware, respectively, and that thereafter said Rhodes assigned his said certificate No. 101 for said shares of stock to his clerk, George C. Gray; that such certificate was surrendered to the company and a new certificate was issued to Gray for the same stock; that said Rhodes received no consideration for said transfer; that all

of the stock so issued to Ware, Rhodes and Gray is unpaid, and that Ware is liable, as the holder of certificate 102, to the creditors of said company in the sum of $1000, and that Ware, Gray and Rhodes are jointly liable in the sum of $1000 as assignors and assignees of said stock, and it is ordered and decreed that Ware pay the sum of $1000 to said receiver, and also that Ware, Rhodes and Gray, or either of them, shall pay to said receiver the sum of $1000 in the same manner as hereinbefore provided as to other stockholders.

The decree further finds that appellant John T. Sickel signed the said subscription for three of said bonds and paid for the same the sum of $3000, and received from said trustee the said bonds and 30 shares of said stock; that said shares were represented in stock certificate No. 168; that on April 27, 1893, said Sickel, without consideration, endorsed on said certificate an order directing said company to re-issue said shares to William G. Sickel, and that said stock was so re-issued by certificate No. 281, and that said William G. Sickel still holds the same; that said shares were a part of the said 8000 shares held by said trustee, and that said John T. and William G. Sickel should have known that said shares were unpaid; that William G. Sickel and John T. Sickel are jointly liable to the creditors of said company in the sum of $3000, the par value of said stock, and it is ordered and decreed that they pay the said sum to said receiver in the manner hereinbefore provided as to other stockholders.

The decree further finds that Egbert W. Gillett, in his lifetime, subscribed to said subscription agreement for five of said bonds; that he received the said bonds from said trustee, and that at the time he paid for said bonds the said trustee held for him in trust 50 shares of said stock, which were a part of the said 8000 shares, and that upon said payment he became the owner of said stock and entitled to possession thereof, but that at said time the said company was

insolvent and the said Gillett failed or refused to take said stock, and the same, unpaid, remained with the trustee for said Gillett, and that he became liable, as holder of said stock, to said company for the par value thereof; that since this cause was submitted to this court said Gillett has died; that his death has been suggested of record and an order entered herein substituting Charles W. Gillett, the executor of his last will and testament, as defendant in his place and stead, and it is decreed that said executor pay, in due course of administration, the sum of $5000 to said receiver in the manner hereinbefore set out as to other stockholders.

The decree further finds that said Gillett became an active promoter in the scheme of MacKaye and Butterworth shortly after its inception; that in return for his services rendered and money advanced by said Gillett to Butterworth and not to said company, said Butterworth gave to Gillett shares of stock in the Spectatoria Company and a due bill for 400 shares of the capital stock of the Columbian Celebration Company when the same should be transferred by MacKaye to said Butterworth; that after the transfer of said 1574 shares of said stock to Butterworth by said Mac-Kaye, as hereinbefore found, said Gillett caused Butterworth to endorse over to Clarence R. Gillett, the brother of Egbert W., certificates numbered 36, 37, 38 and 39, each for 100 shares of the capital stock of said company, which stock was a part of the stock aforesaid issued to Butterworth and represented the 400 shares contracted to be delivered to said Egbert W. Gillett; that thereafter, on September 27, 1892, said Gillett caused said company to issue in the name of Clarence R. Gillett certificates numbered 61 and 62, each for 200 shares of said stock, in lieu of the four certificates aforesaid, and delivered the same to said Clarence R. Gillett; that he immediately caused said Clarence R. Gillett to endorse said certificates numbered 61 and 62 in blank and deliver the same back to him, and that said Egbert W. Gillett has since held said 400 shares as pretended collateral for

a note of $10,000 made by said Clarence R. Gillett in favor
of Egbert W. Gillett, dated July 9, 1892, payable in sixty
days, and pretended to be given by the former to the latter
as payment for said 400 shares.

The decree further finds that in like manner the said
Egbert W. Gillett, in the early part of 1892, received a due
bill from Steele MacKaye for 500 shares of said stock which
were thereafter to be issued to MacKaye; that said order
was given to Gillett by said MacKaye in return for services
rendered and money advanced by said Gillett to MacKaye in
helping to promote the organization of said company; that
said money was loaned and services rendered to MacKaye
and not the said company; that said Gillett, after retain-
ing said order for several months, pretended to assign the
same to his brother, Clarence R. Gillett, and caused said
MacKaye, on December 6, 1892, to deliver to Clarence R.
Gillett certificates numbered 82 to 86, inclusive, each for
100 shares of the capital stock of said company, all made
out in the name of Clarence R. Gillett, and all coming, by
various re-issues, from the 7349 shares re-issued to Mac-
Kaye on May 22, 1892; that said Egbert W. Gillett im-
mediately caused his brother to endorse in blank and de-
liver to him said certificates for the 500 shares of stock so
received by him, and that said Egbert W. Gillett has since
retained possession of said stock, ostensibly as security for
a note alleged to have been made by Clarence R. Gillett to
Egbert W. Gillett for $12,500, dated December 12, 1892,
and pretended to have been given as the purchase price of
said stock; that each of said certificates of stock purported,
on its face, to be full paid and non-assessable, but that all
of said stock was unpaid, and that at the time of making
the said pretended sales of said 900 shares of stock at one-
fourth their face value to Clarence R. Gillett, the latter was
without financial ability to pay said notes alleged to have
been given for said stock, and that his financial condition
was known to his brother, Egbert W. Gillett; that both of

said defendants knew that said 900 shares of stock had not been paid for, and that the issuing of the same as full paid stock, and the transfer of the same, was in bad faith and a fraud upon those who might become creditors of said company; that said Egbert W. Gillett was during his lifetime, and his estate now is, liable as assignor of said stock; that as to the creditors of said company he was during his lifetime, and his estate now is, the real owner of said stock, and that his estate is jointly liable with Clarence R. Gillett, in addition to the sum hereinabove found against him, for the sum of $90,000, and it is ordered and decreed that Charles W. Gillett, as executor of said estate, and Clarence R. Gillett, pay to said receiver the said sum in the manner hereinbefore provided as to other stockholders.

The decree further finds that shortly after June 16, 1892, said Egbert W. Gillett received from Benjamin Butterworth certificate No. 16 for 165 shares of stock, which certificate was made out in the name of said Butterworth and was endorsed by him in blank; that said 165 shares came, by various re-issues, to said Butterworth from the shares given to him by said MacKaye on May 22, 1892; that said stock purported to be full paid but it was entirely unpaid, and that all of said persons who received said stock had notice of that fact; that said stock was given to Gillett by said Butterworth in return for money advanced and services rendered to him or MacKaye and not to said company; that on or about August 15, 1892, said Gillett caused the blank endorsement on said certificate to be filled in by an order directing that 15 of said shares be issued to himself and 150 shares to his brother-in-law, George M. Drake, and thereafter caused the said company to issue certificate No. 33 for 15 shares and certificate No. 34 for 150 shares to Egbert W. Gillett and George M. Drake, respectively; that said Gillett delivered said certificate No. 34 to said Drake and immediately caused him to endorse said certificate in blank and deliver the same to him, Egbert W. Gillett, and

that he has since held the same as pretended collateral security for a note of said Drake for $7500, pretended to have been given by Drake to Gillett as payment for said stock; that the sale was not *bona fide,* and that each of said parties knew, or should have known, that the original issuance of said stock and the subsequent transfers thereof were a fraud upon such persons as might thereafter become creditors of said company; that since the bringing of this suit said Drake has died, leaving no assets of any kind and no letters were ever issued in his estate; that as to the creditors of said company the said stock always has been the property of said Gillett and his estate, and that he became liable for the face value thereof, and it is ordered and decreed that his said executor pay to the said receiver, in due course of administration, the sum of $15,000 in the manner thereinbefore provided.

The decree further finds that said Gillett endorsed certificate No. 33 for 15 shares, and directed the re-issue of 10 shares therefrom to Clarence R. Gillett and five shares to himself; that thereafter certificate No. 51 for 10 shares of said stock was issued in the name of Clarence R. Gillett and certificate No. 53 for five shares was issued to Egbert W. Gillett; that on October 6, 1892, said Clarence R. Gillett and Egbert W. Gillett endorsed the said certificates and directed the re-issue of said 15 shares of stock to Henry E. Weaver, and that on the same day the said stock was so re-issued by said company to said Weaver; that said stock was entirely unpaid, and the original and subsequent issues thereof were a fraud upon such persons who might thereafter become creditors of said company; that said Weaver, as assignee, and Charles W. Gillett, as said executor, and Clarence R. Gillett, are jointly liable in the sum of $1000, the par value of said stock; that Charles W. Gillett, as such executor, is jointly liable for $500 with said Weaver, as assignor of said certificate No. 53, and Weaver, Charles W. Gillett, as executor, and Clarence R. Gillett, are directed to

pay the sum of $1000, and Weaver and Charles W. Gillett, as executors, are directed to pay to said receiver the sum of $500.

The decree further finds that on June 2, 1892, said Butterworth gave to defendant Edward B. Butler certificate No. 14 for 450 shares of stock, for money and assistance contributed by said Butler to Butterworth, and not to said company, in assisting in the promotion of its organization; that said stock was unpaid and was a part of the said 1574 shares issued to Butterworth; that on September 26, 1892, Butler endorsed said certificate No. 14, and directed a certificate for 45 shares thereof be re-issued to Homer P. Knapp and a certificate for 405 shares thereof be re-issued to himself, and that said company so issued said certificates in certificates numbered 59 and 60, respectively, and that the said defendants still retain said certificates; that no money or other consideration was ever paid to said company for said stock, and that that fact was known, or should have been known, by said Butler and Knapp at the time of the issuance of said stock to them; that said Butler is liable to the creditors of said company, as the owner of certificate No. 60, in the sum of $40,500, and that he is also liable, as assignor of said certificate No. 59, jointly with said Knapp, in the sum of $4500, and that Knapp is liable, as assignee, for the same amount. It is ordered and decreed that Butler and Knapp pay to said receiver the sum of $4500 and that Edward B. Butler pay the further sum of $40,500.

The decree further finds that said Butler subscribed and paid for five of said bonds, and that upon such payment the said trustee delivered to him said bonds and certificate No. 146 for 50 shares of said stock; that thereupon the said Butler returned the certificate and directed the said company, in writing, to re-issue three certificates for said stock,—one for 39 shares, one for 10 shares and one for one share,—but to make out said certificates in the name of Walter F. Crone, an employee of said Butler, and on April 24,

1892, the new certificates were so issued and delivered to said Crone in certificates numbered 274, 275 and 276; that all of said stock was unpaid, and that Butler and Crone knew, or should have known, that it was unpaid; that said Butler is assignor of said stock and the real owner thereof, and that he and Crone are jointly liable to the creditors of said company for said 50 shares of stock in the sum of $5000, and it is ordered and decreed that said Butler and. Crone pay to said receiver the sum of $5000.

The decree further finds that on July 7, 1892, Steele MacKaye gave to defendant Henry E. Weaver certificate No. 19 for 90 shares of said stock in return for money loaned and assistance given to said MacKaye individually; that said shares of stock came, by various re-issues, out of a certificate theretofore issued to MacKaye; that Weaver had been actively engaged in the sale of said bonds and the promotion of said company and knew how the capital stock had been originally issued, and that such issue, and the subsequent transfers thereof, were a fraud upon such persons as might thereafter become creditors of said company; that no money or other property had been received by said company for the original issue or the subsequent transfers of said stock, and that said Weaver is liable to the creditors of said company, in addition to the sums theretofore decreed to be paid by him, in the sum of $9000 due and unpaid on said stock, and it is decreed that such sum shall be paid by him to said receiver.

The decree further finds that on April 28, 1893, said MacKaye made a gift to Edward L. Brewster of certificate No. 273 for 100 shares of said stock on that day standing in the name of said MacKaye, and coming, by various re-issues, from the first certificate issued to him; that MacKaye endorsed the said certificate No. 273 and directed that said 100 shares be re-issued to said Edward L. Brewster, and that afterward, on April 28, 1893, the said stock was so re-issued in certificate No. 282; that after the failure of the

230 — 26

corporation was known, on May 2, 1893, without any endorsement by said Brewster, the said certificate was returned to said corporation and marked canceled, and a new certificate for 100 shares, No. 288, was issued in the name of Steele MacKaye and receipted for in his name by S. C. White, Jr.; that the cancellation of said certificate was unauthorized and as to the creditors of said corporation was void; that said Brewster is the real owner of said stock, and that said shares were unpaid, and known to be, by said Brewster, and that he is liable to the creditors of said company in the sum of $10,000, and said Brewster was ordered and decreed to pay to said receiver said sum of $10,000 in addition to the money theretofore decreed to be paid by him.

The decree approves the finding of the master to the effect that all of the general creditors of said company, excepting the employees for the stage and orchestra, were informed of the manner in which said stock was issued to the original subscribers and of the way such stock was purported to have been paid for, at the time they extended credit to the company.

The decree also finds various facts in reference to the liability of stockholders who are not before this court, and those findings, in so far as here immaterial, are omitted from this statement. By the decree no interest was allowed upon any claim, of any character, against the corporation after the filing of the bill, and the decree against each stockholder was for the face value of his stock, without any charge for interest prior to the decree, and the various sums adjudged by the decree against stockholders were made to bear interest at five percentum per annum from June 20, 1905, if not paid by that date. The total liabilities of the corporation as fixed by the decree are:

To bondholders who are liable for stock.............$380,293.08
To bondholders who are not liable for stock........... 52,785.83
To general creditors.................................. 328,986.64

    Total ........................................ $762,065.55

The total of the sums decreed to be paid by stockholders or their legal representatives is $579,000. By the decree each person adjudged a stockholder is required first to pay to the receiver the full par value of his stock. Bondholders are not permitted to set off any part of the bonded indebtedness against their stock liability. All moneys received from stockholders are to be paid *pro rata* to the various claimants according to the amount of their claims, no matter what the character of the indebtedness, excepting one or two small claims for labor, which are preferred. All other claims are placed on the same footing. The stockholders who are also bondholders will, upon distribution, receive back upon their claims which have been allowed on account of the bonds held by them, a portion of the money paid to the receiver by them on account of their stock liability.

The testimony of MacKaye and that of Butterworth was not taken. Both died pending the litigation in the circuit court. They were non-residents, and no personal service was had upon them or upon a number of other non-residents holding stock, which in great part accounts for the fact that the total of the decree against stockholders is much less than the total par value of all the stock.

On July 31, 1905, upon the motion of the receiver, the Chicago Title and Trust Company, for leave to settle the decree against certain of the defendants who desired to adjust their liability under the decree theretofore entered, the court entered a supplemental decree, providing that each defendant could settle his liability under the former decree by paying the amount of the decree against him, and interest, and in case such defendant was the holder of a bond or bonds which had been allowed as a claim by the former decree, in adjusting the amount adjudged against him he should have credit for $300 on account of each $1000 bond so theretofore allowed as a claim, upon his releasing the fund created by the earlier decree from any liability to pay

anything further on the claim which had been allowed and which was based on such bond.

From the principal decree of the circuit court a large number of defendants prayed separate appeals to the Appellate Court for the First District. The cases were there consolidated for hearing, and judgment was there entered affirming the decree of the circuit court in each instance. A number of the cases so determined in the Appellate Court have been brought to this court either by appeal or writ of error, including this case, in which this statement and the following opinion are written. All of these cases, and another hereinafter mentioned in this statement, brought to this court by the executrix of the will of Henry E. Weaver, now deceased, have been consolidated in this court and are here to be determined under the title of this case. The titles and numbers of all such cases so consolidated with this case are the titles and numbers set out in the first portion of this statement. Among the cases so consolidated is an appeal by the executrix of the will of Henry E. Weaver, deceased, from a judgment of the Appellate Court for the First District affirming a decree of the circuit court of Cook county sustaining a demurrer to and dismissing a petition filed by Weaver in a supplemental proceeding in that court which he began after the entry of the principal decree. He died while the appeal was pending in the Appellate Court, and the executrix was substituted.

In the following opinion the word "appellants" will be used as inclusive of appellants, plaintiffs in error and persons who have departed this life since the time when it is alleged they became stockholders in the Columbian Celebration Company and whose legal representatives are parties to the present litigation in this court. The term "appellees" will be used as descriptive both of appellees and defendants in error.

Various errors and cross-errors have been assigned which will sufficiently appear from the opinion.

LEROY D. THOMAN, PECKHAM, PACKARD, ApMADOC & WALSH, CHURCH, McMURDY & SHERMAN, HENRY M. BACON, HARRY J. KENDIG, SAMUEL J. HOWE, R. R. KELLER, and R. A. BURTON, for appellant:

Subscriptions to capital stock may be paid in property, and if the valuation of the property be made by the directors of the corporation in good faith it cannot be impeached by creditors on the ground that it is excessive, and if in this case the inventions of MacKaye were property and were susceptible of value, and the directors in good faith made an estimate thereof, based on the belief of their earning power, honestly entertained, the amount of such estimate is conclusive, and the failure to realize the expectations of the directors can have no weight in determining the question of fraud in making the valuation. *Sprague* v. *Bank,* 172 Ill. 149; *Coleman* v. *Howe,* 154 id. 458; *Whitehall* v. *Jacobs,* 75 Wis. 476; *Colonization Co.* v. *Hayes,* 119 Fed. Rep. 202; *Macbeth* v. *Banfield,* 78 Pac. Rep. 693; *Schenk* v. *Anderson,* 57 N. Y. 147; *Young* v. *Iron Co.* 65 Mich. 111; *Sand Co.* v. *Crematory Co.* 205 Ill. 42; *Iron Co.* v. *Gas Co.* 165 Pa. St. 498; *Kelley* v. *Fletcher,* 28 S. W. Rep. 1099; *Davis* v. *Montgomery Co.* 101 Ala. 127.

An invention or improvement is property, and may be the subject of contract or sale before being patented. *Gaylor* v. *Wilder,* 10 How. 477; *Whitehall* v. *Jacobs,* 75 Wis. 476.

The presumption is, not only that the estimate of value was made in good faith, but that it was correct, and the burden is on the complainants to support their averments to the contrary.

If the creditors of the corporation knew, at the time their indebtedness was created or their contracts made, of the manner in which the stock was paid for, they are estopped to charge fraud in the manner of payment. *Bank* v. *Gustin-Minerva Co.* 42 Minn. 327; *Whitehall* v. *Jacobs,* 75 Wis. 474; *Parmelee* v. *Price,* 208 Ill. 556; *Coffin* v. *Rans-*

*dell,* 110 Ind. 417; *Hospes* v. *Northwestern Manf. Co.* 48 Minn. 174.

The liability of stockholders to creditors will not attach to an assignee of stock until his name is recorded on the books of the corporation. *Railroad Co.* v. *Hambleton,* 77 Md. 341; *Sherwood* v. *Bank,* 195 Ill. 112; *Kerr* v. *Vrie,* 86 Md. 72; 2 Morawetz on Private Corp. sec. 853; *Van-Allen* v. *Railroad Co.* 7 Bosw. 515; *Burgess* v. *Seligman,* 107 U. S. 20; 2 Thompson on Corp. sec. 2436; *File Co.* v. *Garrett,* 110 U. S. 288; *Gray* v. *Coffin,* 9 Cush. 192; *Robinson* v. *Bank,* 94 Fed. Rep. 964; *Richmond* v. *Irons,* 121 U. S. 27; *Stephens* v. *Follett,* 43 Fed. Rep. 842; *Morrow* v. *Steel Co.* 87 Tenn. 262.

The records of a private corporation are not, in and of themselves, competent evidence against third persons to establish their relation of stockholders to the said corporation. *Chase* v. *Railroad Co.* 38 Ill. 215; *Harrison* v. *Paper Co.* 140 Fed. Rep. 385; *Carey* v. *Williams,* 79 id. 906; *Foote* v. *Anderson,* 123 id. 659; *Iron Co.* v. *Greene,* 88 id. 207; *Rudd* v. *Robinson,* 126 N. Y. 113; 2 Thompson on Corp. sec. 1924; *Steele* v. *Dunn,* 65 Ill. 298.

Where subscriptions are made to the bonds of a corporation, with an agreement that the subscribers shall receive, with the bonds, stock of the corporation, full paid and non-assessable, the stock will be held paid and the stockholders not liable to creditors. *Handley* v. *Stutz,* 139 U. S. 417; *Rood* v. *Whortin,* 74 Fed. Rep. 118; *Morrow* v. *Steel Co.* 87 Tenn. 262; *Davis* v. *Montgomery Co.* 101 Ala. 127; *Christenson* v. *Eno,* 106 N. Y. 97.

SCOTT, BANCROFT & STEPHENS, E. R. BLISS, HERRICK, ALLEN, BOYESEN & MARTIN, and HORACE K. TENNEY, (REDMOND D. STEPHENS, EDGAR A. BANCROFT, and I. K. BOYESEN, of counsel,) for appellees:

The capital stock of a corporation must be paid for in money or money's worth, and any device by which the di-

rectors attempt to make the stock appear full paid when it is not so in fact, and every agreement to accept property of unknown value, or of less value than the face of the stock, in exchange for the stock, and to treat that stock as full paid, is void as to creditors. *Melvin* v. *Insurance Co.* 80 Ill. 446; *Insurance Co.* v. *Frear Stone Manf. Co.* 97 id. 537; *Olmstead* v. *Vance,* 196 id. 236; *Alling* v. *Wenzel,* 133 id. 264; *Coleman* v. *Howe,* 154 id. 458; *Sprague* v. *Bank,* 172 id. 149; *Sand Co.* v. *Crematory Co.* 205 id. 42; *Thayer* v. *Mining Co.* 40 Ill. App. 344; *Chisholm* v. *Forney,* 65 Iowa, 333; *VanCleve* v. *Berkey,* 143 Mo. 109.

An Illinois corporation may accept property in payment for stock, but that stock becomes full paid only when the property is taken and valued in the exercise of a business judgment fairly and honestly directed. The "good faith rule" has been repudiated in Illinois. *Coleman* v. *Howe,* 154 Ill. 458; *Dean* v. *Baldwin,* 99 id. 582; *Sprague* v. *Bank,* 172 id. 149; *Thayer* v. *Mining Co.* 41 Ill. App. 344; *Rogan* v. *Bank,* 93 id. 42; 7 Thompson on Corp. sec. 8646.

The appellants who received stock from the American Trust and Savings Bank, or in whose behalf stock was held by it, are not innocent purchasers for value. They were not purchasers at all, and all had actual as well as constructive notice that this stock, which the company gave them for nothing, was unpaid stock. *Clapp* v. *Peterson,* 104 Ill. 26; *Bank* v. *Burch,* 141 id. 519; *Olmstead* v. *Vance,* 196 id. 236; *Alling* v. *Wenzel,* 133 id. 264; *Coleman* v. *Howe,* 154 id. 458; *Higgins* v. *Bank,* 193 id. 394.

The money paid under the subscription agreement was a payment for bonds only, and cannot operate as a payment, partial or full, for the stock. *Rolling Mill Co.* v. *Machine Co.* 75 Fed. Rep. 554; *Camden* v. *Stuart,* 144 U. S. 104.

The subscribers for bonds who paid for their bonds *eo instanti* became the owners of the stock held in trust for them by the American Trust and Savings Bank, and, as such owners, they were liable for the amount unpaid on the

stock, whether they took it from the trustee or not.   *Van-Allen* v. *Railroad Co.* 7 Bosw. 515.

The actual delivery of the stock certificate is not necessary in order to make one a stockholder.   *Burr* v. *Wilcox,* 22 N. Y. 551; *Glass Co.* v. *Dewey,* 16 Mass. 94; *Spear* v. *Crawford,* 14 Wend. 20; *Mitchell* v. *Beckman,* 64 Cal. 117; *Chaffer* v. *Cummings,* 37 Me. 76; *Upton* v. *Englehart,* 3 Dill. 496; *Railroad Co.* v. *Harris,* 46 Miss. 17.

The right of a creditor to enforce an unpaid stock liability under the statute is not affected, in any degree, by the knowledge of the creditor that the stock was not paid in full. *Sprague* v. *Bank,* 172 Ill. 149.

Mr. JUSTICE SCOTT delivered the opinion of the court:

*First*—It is contended by appellants that in accepting certain property in payment of MacKaye's subscription to the capital stock of the Columbian Celebration Company to the amount of $1,999,600, the directors fixed that value upon the property offered in the fair and honest exercise of their judgment as to its worth, and that the stock must therefore be regarded as fully paid and non-assessable, even if the directors erred in their judgment as to its value.

When the board of directors met on May 16, 1892, the principal asset of the corporation was MacKaye's subscription for stock to the amount above mentioned.   The law required the directors, in collecting that subscription, to obtain from MacKaye "money or money's worth" to the full amount of the subscription.   (*Coleman* v. *Howe,* 154 Ill. 458; *Garden City Sand Co.* v. *Crematory Co.* 205 id. 42.) "Money or money's worth" means cash or its equivalent. If the directors saw fit to accept property in lieu of cash they could only take it at its fair cash market value, if it was property which had an ascertainable market value.   If it had no ascertainable market value, then the only price at which the directors could purchase it was such price as could be realized by selling it to others for cash.

On the date last .mentioned the directors of the corporation entered into a contract with ·MacKaye, by which, in satisfaction of his liability on his subscription, MacKaye transferred to the corporation the .sole and exclusive right to use eleven alleged new, useful and valuable improvements in scenic art; also the right to use and produce a "spectatorio" or play entitled "The Great Discovery," of which it is said MacKaye was the author, in the· States of Illinois, Indiana, Michigan, Minnesota, Iowa and Missouri for a period of fifteen years, burdened with a ten per cent royalty reserved to MacKaye. At the time the· contract was made no application had been made for a patent on any of the inventions. The description of the inventions contained in the contract is very general in character. With one or two exceptions the descriptions are not such as would enable the reader to identify the invention. They consist usually of the name given by MacKaye to the invention, followed by a statement of the object of the invention. The play, "The Great Discovery," had not been written. / At the time Mac-Kaye's subscription was so satisfied the directors were Mac-Kaye, Butterworth, Crosley, White and Edmonds. Crosley did not attend the meeting of May 16, 1892, and MacKaye did not vote upon the proposition in reference to the payment of his subscription by the transfer of the rights above enumerated. Those who voted in favor of accepting the proposition were Butterworth, White and Edmonds. Butterworth was a co-promoter with MacKaye, and a few. days later, in accordance with an arrangement effected prior to May 16, 1892, received from MacKaye a considerable portion of the stock subscribed for by the latter. Edmonds was an assistant to Butterworth, as secretary of the World's Columbian Exposition. White was a clerk in the employ of MacKaye and Butterworth, doing clerical work in connection with the promotion of MacKaye's scheme. So far as the transaction of business affecting the corporation was concerned, White and Edmonds were wholly dominated by

MacKaye and Butterworth. Edmonds testified that he "never formed any intelligent conclusion as to the value of the patents," referring to the inventions the right to use which was transferred by the contract; and further: "I did not consider it [the MacKaye proposition which was accepted] in the sense that I was going to put a lot of money in it myself, but I honestly believed on May 16, 1892, that the resolution was for the best interests of the company and was a good proposition for it." White says: "I don't remember making any inquiry, as a member of the board of directors or an officer, into the merits of these inventions."

It will no doubt be agreed that the rights transferred to the corporation by the contract were without market value. It was then the duty of the directors, before accepting the rights transferred by this contract in payment of this large subscription, to ascertain whether those rights had value, and if so, what the value was. The natural and reasonable method to be pursued in determining that question would have been to have applied to men not interested in the promotion of MacKaye's scheme, who were of wide experience in the production of great spectacular plays, for their views in reference to the worth of the rights which MacKaye proposed to transfer. No such investigation was made. No other steps were taken to ascertain the value of the rights MacKaye proposed to transfer, such as would have been taken by directors seeking to deal honestly and fairly with the assets of the corporation. It was the duty of these directors to ascertain the value of these rights precisely as they would have done had they intended to invest money in such rights themselves, and that they did not do. It is no doubt true that if the directors, in the fair, honest and intelligent exercise of their judgment, make a mistake and accept property at a price greater than its real value, such can not be regarded as a fraudulent over-valuation of the property; but that rule only applies where the transaction constitutes a valid contract of bargain and sale, made in good

faith on the part of the directors and in the intelligent exercise of fair and honest judgment on their part. There was no such transaction here. The transfer to the corporation was a mere sham. It was, in fact, a sale by MacKaye to MacKaye, and was, in law, a fraud. It was a transfer of the right to use for a period of years, in a limited territory, an unwritten play and inventions not perfected and not accurately described. The writing of the play and the perfecting of the inventions depended upon MacKaye moving in the matter in the future, and he is conceded to have been practically without property other than these inventions and this play. The play, in fact, never was written. Successful applications were made, after the execution of the contract, for patents upon all the inventions except one. As to that one the application was denied. The evidence leads irresistibly to the conclusion that had the directors on May 16, 1892, after the signing of this contract, sought to have disposed of the rights thereby transferred, they could not, in the world of the drama or elsewhere, have obtained for the rights transferred to the company by that contract anything of value whatever. It follows that MacKaye's stock subscription remained wholly unpaid.

*Second*—The certificates for MacKaye's stock recited that the shares were "fully paid and non-assessable," and the law is, that where stock is so issued and the holder thereafter sells or assigns the same, and the assignee acquires it in good faith and without notice that it has not been fully paid, he cannot be made liable if, in fact, the stock is not fully paid. (*Coleman* v. *Howe, supra; Sprague* v. *National Bank of America,* 172 Ill. 149.) Appellants insist that, even if this stock was wholly unpaid, they acquired it in good faith without notice of that fact, and are therefore not liable. "Notice," in this connection, must be given the ordinary signification of that term, and means knowledge that the stock was unpaid, or knowledge of such facts as would have put an ordinarily prudent man upon inquiry, when the inquiry

might reasonably be expected to have led him to knowledge that the stock was unpaid. (*Russell* v. *Ranson, 76* Ill. 167.) Many of the appellants knew precisely how MacKaye had paid for his stock, and all of the appellants acquired their stock, as they knew, within a few months after the organization of this corporation. They obtained it without giving. any valuable consideration therefor, except in a few instances where it is claimed that a small percentage of the face value of the stock was paid therefor by services rendered or by other methods, not including cash actually paid at the time of the transfer of the stock. The fact that the corporation had just been organized, and that its stock was being transferred without, or practically without, any valuable consideration, was, we think, sufficient to put a reasonably prudent man upon inquiry, and that inquiry would, in our judgment, have led to knowledge of the fact that the stock was wholly unpaid.

*Third*—Appellants who are bondholders express the view that, having entered into a contract by which they were to pay a certain sum of money to the corporation and receive in exchange therefor bonds equal in face value to the amount of money paid, and stock of the corporation, fully paid and non-assessable, to the same amount, the money paid should be held a payment for the stock and not for the bonds, and consequently they cannot now be held liable for the subscription price of the stock. The proof shows conclusively as to the great majority of appellants who are bondholders and satisfactorily as to the other appellants who are bondholders, that each signed a subscription agreement which provided that the undersigned "hereby subscribe for the number of the first mortgage bonds of the Columbian Celebration Company, of $1000 each, set opposite our names, respectively, as hereunder written, subject, however, to the following conditions :" First, no subscription should be binding until $500,000 had been subscribed; second, to each subscriber, on the payment of the amount subscribed by him,

there should be delivered, by a trustee appointed for that purpose, "the number of bonds subscribed and paid for by him, and in addition thereto an amount of the capital stock of the Columbian Celebration Company equal, at its par value, to the par value of the bonds subscribed and fully paid for by such subscriber." If the par value of the bonds subscribed was fully paid by the subscriber, the money subscribed and paid could only be held to apply upon the purchase price of the bonds. No portion of the money paid would remain to apply on the stock. The agreement plainly indicates that the money paid by the bondholders was payment for the bonds alone. All parties to the transaction, as appears from the evidence, looked upon the stock which accompanied the bonds of each subscriber as a bonus.

*Fourth*—It appears that a few of the appellants who are bondholders paid their subscriptions and accepted the bonds but failed or refused to take the stock to which they were entitled from the custody of the trustee, and that a few others paid their subscriptions and failed or refused to take actual possession of either bonds or stock, and it is claimed that these appellants did not become stockholders. Under the subscription agreement, when the necessary $500,000 was subscribed and payment was made by any subscriber he became the owner of the stock which was to accompany his bonds. Whether or not he obtained the certificate or left it with the trustee is a matter of entire indifference. It was by virtue of the subscription contract that he became the owner of the stock. Whether he actually received the certificate is immaterial. *Van Alen* v. *Illinois Cent. Railroad Co.* 7 Bosw. 515; *Chester Glass Co.* v. *Dewey*, 16 Mass. 94; *Spear* v. *Crawford*, 14 Wend. 20; *Burr* v. *Wilcox*, 22 N. Y. 551.

It has also been suggested on behalf of those who did not take actual physical possession of the stock certificates, that if nothing was paid for the stock it was optional with the subscribers to take the stock or leave it when they paid for the bonds. A careful reading of the subscription agree-

ment, which is set out *in hæc verba* in the foregoing statement, shows that the subscribers were under precisely the same obligation to receive the stock that they were to accept the bonds. If, as between themselves and the corporation, they had the right to decline to take certificates of stock for which they had paid nothing, they had no such right as to creditors. When they became the owners of the stock, though they acquired it without paying anything therefor, they incurred a contingent liability to creditors which was not to be avoided by refusing to receive the certificates.

Again, it is urged that the contract did not provide for the delivery of any particular stock but merely for the delivery of "fully paid and non-assessable stock," and that if the stock delivered or tendered was not of that character the subscriber was under no obligation to accept it. Certificates for all the stock of the corporation had been issued when the subscriptions were taken for the bonds. None of the stock was fully paid and non-assessable. Nothing of value had been paid for it or any of it. The bond subscribers had notice of this fact or of such facts as put them upon inquiry. Under these circumstances the contract must be held to have reference to the stock of the company as it then existed, viz., wholly unpaid but represented by certificates stating that the stock was fully paid and non-assessable.

*Fifth*—The master found that certain of the creditors knew, at the time credit was extended to them, that the stock issued to MacKaye had been issued as fully paid and non-assessable in consideration of the transfer by MacKaye to the corporation of certain rights in his inventions and in his play entitled "The Great Discovery," and appellants insist that those creditors are estopped to aver that the stock is not fully paid. In *Sprague* v. *National Bank of America, supra,* we said that the liability of the stockholder to the creditor for the unpaid portion of the subscription for stock is not "in anywise affected by the fact that the creditor knew or did not know, when he extended credit to the corporation,

that the stock was in part unpaid." We are entirely satisfied with that view, and it is decisive of this question.

*Sixth*—In allowing the claims of the bondholders the court permitted the recovery of interest only to the time of the filing of the bill, and those bondholders who have appealed insist, upon the authority of *Barker* v. *International Bank,* 80 Ill. 96, that interest should have been allowed to the time of the decree. That was a case of a bill to foreclose a deed of trust given to secure a promissory note, and the case merely announces the ordinary rule. The holder of the note is entitled to a decree for the amount of his note and interest at the rate fixed by the note to the date of the decree, and if the property does not satisfy the debt he is entitled to a decree *in personam* against the maker of the note. Where the assets of a corporation, including stock liability, are less than its indebtedness, and it passes into the control of a court of chancery for the administration of its assets and for dissolution, the general rule is that interest is not allowed on the claims against the funds. The delay in distribution is the act of the law. It is a necessary incident to the settlement of the estate. The rights of all the creditors are fixed when the court takes jurisdiction of the property. (*Williams* v. *American Bank,* 4 Metc. 323; *Thomas* v. *Minot,* 10 Gray, 263; *Thomas* v. *Western Car Co.* 149 U. S. 94; *People* v. *American Loan and Trust Co.* 172 N. Y. 371.) It is therefore inequitable that interest should thereafter be allowed on the claims where certain of the claims draw interest at one rate and others draw interest at a lower rate or do not draw interest at all. If interest under such circumstances was allowed at the rate fixed by the contract, and the litigation extended, as here, through many years, the mere lapse of time would enable those holding claims drawing a high rate of interest to materially lessen the proportion of the assets which would pass to those holding claims drawing a lower rate of interest or drawing no interest at all. This is not permitted.

Prior to the filing of the bill herein a bill had been filed by MacKaye against the corporation and others for the alleged purpose of protecting the rights of those interested in the corporate property, and a receiver had been appointed in that suit prior to the filing of the bill in this suit. Afterward that suit was consolidated with this and the receiver who had been appointed in that suit was appointed receiver in this. Under these circumstances we think it not inequitable that the date of the filing of the bill in this suit should be, as it was, fixed by the court as the date when the bonds should cease to draw interest as against the fund to be administered by the court. If this was a case where, after the administration of the fund, there was any party against whom the claimholders could take a personal judgment, as to such party, of course, the claim would draw interest according to the terms of the contract upon which it was based.

*Seventh*—On July 31, 1905, after the principal decree had been enrolled, the court entered a supplemental decree, which appellants regard as void. That decree finds that certain of the defendants desired to make settlement of their liabilities as fixed by the decree theretofore entered, and the decree points out a method to be pursued by the receiver in adjusting the liability adjudged against those defendants and against any other defendant desiring to make payment. Appellants have not pointed out any way in which their rights are prejudiced by that supplemental decree, and we have been unable to perceive that they are in any manner harmed thereby.

*Eighth*—The court allowed a claim against the estate of the corporation, in favor of the First National Bank of Chicago, in the sum of $1386.29. It is contended by appellants that nothing was due to the bank. Whether the amount allowed was due depends, so far as this suit is concerned, entirely upon the question whether a finding of the master in reference to a matter of fact is correct. Neither of appellants seems to have excepted to that finding of fact, and

there is therefore nothing upon which to base the assignment of error attacking this allowance.

*Ninth*—In the principal brief filed herein on behalf of the appellants, special argument is made as to the liability of each of the following appellants: The executor of the will of Egbert W. Gillett, deceased, Edward B. Butler, Homer P. Knapp and Edward L. Brewster.

Egbert W. Gillett departed this life, testate, after the master's report was filed and before the decree was enrolled. His executor was substituted. Egbert W. Gillett, in his lifetime, rendered certain services and advanced certain monies to MacKaye and Butterworth, and in exchange received from MacKaye a due bill calling for 500 shares and from Butterworth a due bill calling for 400 shares of stock of the corporation. He assigned these due bills to his brother, Clarence R. Gillett, and testifies that he sold the stock to be issued thereon to his brother for twenty-five per cent of its par value and took his brother's promissory notes for the purchase price. Clarence R. then presented the due bills, received the certificates of stock, assigned them in blank and deposited them with Egbert W., ostensibly as security for the notes given for the shares of stock. The notes contained provisions authorizing Egbert W. to sell the stock at public or private sale, before or after the maturity of the notes, without notice to the maker. Egbert W. was held liable for that stock and also for 150 shares of stock, to which he seems to have been entitled as a bonus, accompanying stock of the Spectatoria Company, which he purchased from Mac-Kaye and Butterworth. He caused the certificate for this stock in the celebration company to issue to his brother-in-law, George M. Drake. The same course was pursued in this instance as in that of the transaction with Clarence R. Gillett. Drake gave Egbert W. his promissory note for twenty-five per cent of the par value of the stock, and after receiving the certificate assigned it in blank and deposited it with Egbert W., for the apparent purpose of securing the

promissory note. That note contained a power of sale similar to that found in the notes given by Clarence R. Both Drake and Clarence R. were practically insolvent. Drake never paid any cash on his note, although a credit of $50 appears thereon, which was the result of the settlement of an account between the maker and the payee of the note. The notes of Clarence R. also remain in large part unpaid, the credits appearing on those notes having resulted from the closing up of certain business transactions in which Clarence R. and Egbert W. are said to have been interested together.

We are satisfied from the evidence that Egbert W. Gillett was the owner of this stock. The certificates assigned in blank were in his possession. Drake and Clarence R. were without financial responsibility, and were evidently mere dummies, to whom Egbert W. caused the certificates to issue. Under these circumstances the decree against him for the face value of this stock was a just and proper one. Cook on Corporations, 253; *Houghton* v. *Hubbell,* 91 Fed. Rep. 453; *Dunn* v. *Howe,* 107 id. 849; *American Alkali Co.* v. *Kurtz,* 134 id. 663; *Ohio Valley Nat. Bank* v. *Hulitt,* 204 U. S. 162.

The master also found Egbert W. was liable for 50 shares of stock accompanying the bonds for which he subscribed, making a total of 1100 shares of stock. Egbert W. also acquired 15 additional shares of stock and received for the same certificate No. 33. Thereafter he returned this certificate and directed the re-issue of a certificate for 10 shares to Clarence R. and 5 shares to himself. Certificates issued accordingly, and both were thereafter transferred to Henry E. Weaver. The master did not find Egbert W. liable for these 15 shares of stock. The court, however, without any exception being taken to the report of the master in that regard, found Egbert W. liable for these 15 shares and entered a decree against him for a total of $111,500, being the par value of the 1115 shares.

Counsel criticises the chancellor very sharply for entering a decree holding the executor liable for the 15 shares once represented by certificate No. 33, basing his criticism principally upon the fact the master's finding in reference to the liability of Egbert W. in this regard was not challenged by an exception. The master correctly found, as a matter of fact, that Egbert W. had been the owner of these 15 shares. His finding as to the total liability of Egbert W. was a mistaken legal conclusion. It is not necessary for the party dissatisfied with the legal construction which the master places upon facts correctly stated, to except to the report. "Exceptions relate to matters of fact, and the question whether the master has drawn an incorrect legal conclusion from the facts will be heard without exceptions." (*Von-Platen* v. *Winterbotham,* 203 Ill. 198, and authorities cited at page 202.) The conclusion of the chancellor with reference to Egbert W.'s liability for these 15 shares was correct and was rightfully embodied in the decree, even in the absence of an exception to the report of the master. Counsel is plainly in error in stating that the bill contains no averments under which proof of the facts above stated as to Egbert W. could be made. It is also said that there is no prayer for the relief granted as to Egbert W. There was in the bill a prayer for general relief. No other prayer was necessary. Other objections interposed to the decree holding Egbert W. liable for the 1115 shares of stock are disposed of by what has already been said in this opinion.

Edward B. Butler was held liable for 50 shares of stock upon his bond subscription and for 450 shares of stock which he obtained from Butterworth that were turned over to him by Butterworth on account of money loaned and other favors extended by Butler to Butterworth. Homer P. Knapp was held liable for 45 shares of stock which had been transferred to him by Butler in payment of about $1000 which Butler owed Knapp upon the conclusion of a real estate transaction between them. Objections made to the decree

in regard to Butler's liability and that of Knapp are disposed of by what is said elsewhere in this opinion.

Edward L. Brewster was held liable by the master for 50 shares of stock. The court found that there was evidence that he had been the owner of an additional 100 shares of stock and rendered a decree against him for the par value of 150 shares of stock. The finding of the court as to the additional 100 shares of stock charged against Brewster by the decree is based upon the following facts: The blank certificates of stock were printed in a so-called stock book, and each was attached to a stub upon which was printed a blank receipt. When the certificate was issued it was detached from the stub, and the person to whom it was issued and delivered signed a receipt therefor on the stub. Stock certificate No. 273 was issued to Steele MacKaye, and was thereafter returned and again attached to its stub. At the time of the hearing before the master there appeared on the back of the certificate an assignment of the stock represented by the certificate, signed by Steele MacKaye. The blanks in the printed form upon which the assignment is written are filled in with words written in black ink, the effect of which was to make an apparent assignment of the stock to Brewster. Through the name of Brewster, in the body of the assignment, however, is drawn a line in red ink, and the name "Steele MacKaye" is written in red ink directly after Brewster's name, the effect of which, if the name of Brewster be regarded as erased, is to make the assignment apparently one from MacKaye to MacKaye. Across the face of the certificate is written: "Surrendered and canceled this 28th day of April, 1893, for re-issue.—Sidney C. White, Jr., Sec'y." The receipt on the stub of that certificate is dated April 22, 1893, and signed "Steele MacKaye." Below MacKaye's signature on the stub is written, in red ink, "Re-issued in ctf. No. 282 to E. L. Brewster." A line is then drawn through the name "E. L. Brewster," and below it is written, "S. MacKaye in ctf. No. 288." Certificate

No. 282 remains in the stock book and has never been detached from the stub. It was filled out and signed by the proper officers under date of April 28, 1893, and runs to MacKaye for 100 shares of stock. Across the face is written: "Canceled May 1, 1893; issued by mistake; re-issued to Steele MacKaye in certificate No. 288.—Sidney C. White, Jr., Sec'y." No receipt for this certificate No. 282 appears on the stub. Certificate No. 288 is not in the stock book. The stub of that certificate shows that it was issued to Steele MacKaye, and under the words "from whom transferred" is written, "Steele MacKaye, ctf. No. 273." Following that is a receipt for the certificate No. 288, dated May 2, 1893, and reciting that the certificate is for 100 shares. That receipt is signed, "Steele MacKaye, per S. C. White, Jr." There is no evidence that Brewster ever had certificate No. 273, that he ever owned or had any claim to the stock thereby represented, or that he ever had any knowledge that his name appeared in the assignment on the back of certificate No. 273 or on the stub thereof. White, the secretary, testified, but was asked nothing in reference to Brewster's name appearing in that assignment or on that stub, and the presence of that name in those two places is wholly unexplained. When Brewster testified, counsel for complainants apparently did not seek to charge him with liability as to the stock once represented by certificate No. 273, and he was asked nothing in reference thereto by counsel for either party.

We have recited all the evidence considered by the chancellor in determining the question of Brewster's liability for the additional 100 shares of stock now in question, and are of the opinion that it does not prove that Brewster ever owned the stock, and that the decree, in so far as it finds him liable for the value of the additional 100 shares, is erroneous.

*Tenth*—In addition to the principal brief and argument and brief in reply for appellants, separate briefs and argu-

ments have been filed for each of the appellants Edwin L. Lobdell, Milton W. Kirk, Edward C. Berriman, Lyman J. Gage and Robert Stuart, and two separate briefs and arguments have been filed for the executrix of the will of Henry E. Weaver, deceased. There have also been filed two additional reply briefs, one in behalf of Lyman J. Gage and one in behalf of Robert Stuart. These cases having all been consolidated there should have been but one brief and argument and one reply brief filed on behalf of all those complaining of the decree. We have, however, given to the additional briefs and arguments and the additional reply briefs the same consideration that they would have been entitled to had they been properly upon the files. The additional briefs and arguments, excepting those filed on behalf of Weaver's executrix, present only questions that have already been disposed of in this opinion.

The decree of the circuit court found Weaver liable for the par value of 155 shares of stock. The first brief and argument filed on behalf of his executrix is devoted to the question of his liability for this stock. The only contention made by that brief and argument which requires particular attention is in reference to 90 shares of stock at one time held by Weaver, which the executrix avers he held merely as security for money loaned, and for that reason she conceives that he was not liable therefor. Certificate No. 13 for 4361 shares of stock was originally issued to MacKaye. He returned that certificate and in lieu thereof several other certificates were issued. One was for 90 shares of stock and was issued to Weaver. That certificate had been detached from the stub and did not appear in evidence. Weaver's receipt for that certificate of stock, bearing his own signature, appears on the stub of the certificate under date of July 7, 1892. The presumption from this, in the absence of any contrary showing, would be that Weaver was the owner of the stock. It is urged that his testimony shows that this was not true. He testifies that he hasn't any idea where the

90 shares came from; that he don't know what he did with the stock; doesn't know whether he now has the certificate in his possession; that if he received it he paid for it; that if he paid anyone for it he paid MacKaye; that he paid MacKaye $2500 for Spectatoria stock; that he thinks Mac-Kaye "turned over some Celebration stock when I did that; don't recollect that I paid anything to him for this stock; I paid MacKaye money for pay-rolls; whether that related to this or not I don't know." On cross-examination he expressed the belief that he loaned MacKaye money on Spectatoria stock of the par value of $2500, and that at the same time he thinks he got the 90 shares of stock in the Columbian Celebration Company which is in question, and that MacKaye agreed to pay him $2500 and take the stock back at some future time. This testimony, as a whole, is entirely too indefinite to overcome the presumption arising from the fact that the certificate was issued to him, and that he receipted for the same without indicating that he was other than the absolute owner of the stock represented by the certificate.

After the decree against the stockholders had been entered, and on June 16, 1905, Weaver filed in the circuit court a petition asking that the decree be vacated as to him and that he be permitted to file a cross-bill. From that petition it appears that in May, 1905, he received a letter from Leroy D. Thoman, an attorney at law who had appeared for him and for a great number of other alleged stockholders in the circuit court, advising him that a decree was about to be entered in the case and stating that Thoman had represented him for twelve years in the litigation; that shortly afterward he was advised by another letter from Thoman that the decree had been entered; that he then made an investigation and learned that he had been held liable for $15,-500 as a stockholder; that he had not theretofore known that Thoman had acted as his solicitor in the case; that he called upon Thoman, and learned from Thoman that the lat-

ter had been retained to act as solicitor for him by E. W. Gillett. The petition avers that Weaver never authorized Gillett to retain Thoman, never authorized Thoman to represent him, and never knew of Gillett's action until advised by Thoman; that at the time he was served with summons he was insolvent and was unable to retain a lawyer to defend him; that he then believed that he had a good defense to the case made by the bill, but believed that owing to his insolvent condition a decree against him would not be collectible; that in April, 1893, he made a voluntary assignment, under the law of the State, for the benefit of his creditors; that in 1899 he filed a voluntary petition in bankruptcy in one of the district courts of the United States and in due course obtained a discharge in bankruptcy; that John H. Hamline, who at an earlier time had been for many years attorney for petitioner, told him, after the termination of the bankruptcy proceeding, that his discharge would be a complete protection to him as against the claims of the creditors in the case at bar; that Hamline, who represented a portion of the complainants in the bill, then stated that he would not ask for a decree against him, and that, relying upon the statement of Hamline, he (Weaver) paid no further attention to the case; that since the entry of the decree against him he has been advised that it will be necessary for him to file a cross-bill setting up his discharge in bankruptcy. The proposed cross-bill accompanied the petition, and avers that Thoman's appearance for Weaver was without the knowledge or consent of the latter, and interposes the discharge in bankruptcy. To the petition appellees demurred. The demurrer was sustained and the petition dismissed. Weaver appealed to the Appellate Court for the First District. The decree dismissing the petition was affirmed, and his death having occurred, his executrix appeals to this court.

The second special brief filed in this court on behalf of the executrix is devoted to the expression of her views with

reference to the decree dismissing the petition and the judg-
ment affirming that decree.    The decree rendered against
Weaver in the original suit was entered on May 20, 1905.
The petition avers that he received Thoman's letter in May,
1905, advising him that a decree was about to be entered.
It does not appear from the petition at what time in May
this letter was received.    For aught that is shown it may
have been nineteen days before May 20.    The petition must
be construed most strongly against the petitioner.    It was
his duty, if he desired to be heard in reference to the decree
that was to be entered, to present his views or make his de-
fense prior to the time the decree was signed, if he had an
opportunity to do so.    It does not appear from this petition
but that his opportunity so to do was abundant.    He could
not rightfully rely upon the assurance of the attorney for a
few of many creditors that no decree would be taken against
him.    The petition does not show the exercise of diligence
on his part, and for that reason the demurrer thereto was
properly sustained, and the judgment of the Appellate Court
affirming that decree was correct.

*Eleventh*—Appellees urge certain cross-errors.    Their
first contention is, that the appellants who were bondholders
should not be permitted to share in the fund arising from
the stock liability, for the reason that they themselves par-
ticipated in what appellees regard as a fraudulent scheme
designed to prevent collection of the moneys due for stock.

The second cross-assignment affords basis for the con-
tention made by appellees that interest at five percentum per
annum should have been awarded against the stockholders
on the amount of their stock liability from the date of the
filing of the bill up to the time of the decree, and that as
the decree against each stockholder is only for the par value
of the stock held by him, it is erroneous.    The supplemental
decree above referred to, taken on July 1, 1905, after the
filing of the decree against the stockholders, was entered
on the motion of the receiver, who is one of the appellees.

From that decree none of the appellees appealed and none of them have sued out a writ of error to review it. On the contrary, they insist it should be affirmed. By that decree the receiver was authorized to make settlement with any of those against whom the decree of May 20, 1905, had passed, in satisfaction of their liabilities as fixed by that decree. As the amount adjudged against each stockholder by the decree of May 20, 1905, is to be accepted by the receiver as in full of his stock liability, those making settlement under the supplemental decree could not thereafter be required to pay any sum in addition to the amount paid in making such settlement. The insistence of appellees that this supplemental decree should be affirmed might perhaps be regarded as an acceptance of the decree of May 20, 1905, and as an election to abide by the terms thereof. The cross-errors assigned apply as well to the rights of stockholders who made settlement by virtue of the supplemental decree as to those of stockholders who have brought the record of the circuit court here; but those stockholders who did not appeal or sue out a writ of error are not parties to the proceeding in this court, as the decree, as against the various stockholders, was, in effect, a separate decree as to each. The appeal of the stockholder from the decree and the assignment of cross-errors in this court upon that appeal do not bring before this court stockholders not appealing or suing out a writ of error and to whom the particular portion of the decree appealed from does not apply. Appellees, as above indicated, have not questioned the entry of the supplemental decree by the assignment of any error or cross-error in reference thereto. On the contrary, they insist that it was a proper exercise of the power of the circuit court. As we have stated, that decree permits defendants who appeal and defendants who do not appeal to settle their liability as fixed by the decree of May 20, 1905, upon the terms of that decree. Inasmuch as appellees are content with the supplemental decree we are of the opinion that their cross-errors should not

be considered. If the cross-errors are well assigned, the original decree certainly should not be reversed unless the supplemental decree be also reversed, and as appellees do not attack the supplemental decree it cannot be reversed merely for the purpose of opening a way for the entry of a judgment here reversing the original decree upon their assignments of cross-error.

The judgment of the Appellate Court in this case, and in all the cases consolidated herewith, will be affirmed, excepting only the case of Edward L. Brewster, appellant, against the Chicago Title and Trust Company, receiver, and others. In the *Brewster case,* so excepted, the judgment of the Appellate Court will be reversed and the decree of the circuit court will be reversed in so far as it requires Brewster to pay the sum of $15,000 on account of stock liability, and a judgment here will be entered against Brewster, and in favor of the receiver, for the sum of $5000, with interest thereon at five percentum per annum from June 20, 1905, which shall be in full of Brewster's stock liability, and which, when collected, shall be distributed by the receiver in accordance with the directions of the circuit court. The costs of this court occasioned by Brewster's appeal will be divided, one-half to be paid by Brewster and the other half by the appellees. In each of the cases other than that of Brewster the ordinary judgment for costs will be entered against the appellant.

Appellees move that the cost of a supplemental abstract filed by them be taxed. The supplemental abstract was unnecessary. The motion will be denied.

> *Judgment affirmed in each case excepting that of Brewster. In Brewster's case judgment of the Appellate Court and decree of the circuit court reversed and judgment here.*